No. 81-74

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

BERNARD JAMES FITZPATRICK,

Petitioner and Respondent,

vs.

STATE OF MONTANA,

Respondent and Appellant.

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Big Horn
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, argued, Helena, Montana
Marc Racicot, Prosecution Coodinator, Helena, Montana
John Maynard argued, Assistant Attorney General, Helena,
 Montana
James Seykora argued, County Attorney, Hardin, Montana

For Respondent:

Robert L. Stephens, Jr. argued, Billings, Montana
Timothy K. Ford argued, Seattle, Washington

Submitted: April 29, 1981

Decided: SEP - 2 1981

Filed: SEP - 2 1981

_Thomas J. Kearney_

Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

State of Montana appeals from the Big Horn County District Court's denial of the State's motion to dismiss a petition for post-conviction relief. Petitioner cross-appeals from the District Court's denial of his request for an evidentiary hearing on his post-conviction petition.

Bernard Fitzpatrick (petitioner) was convicted of deliberate homicide, aggravated kidnapping, and robbery, and sentenced to death in 1975. This Court reversed and remanded for a new trial. State v. Fitzpatrick (1977), 174 Mont. 174, 569 P.2d 383. After a second trial, petitioner was convicted of the same offenses and again sentenced to death. This Court affirmed. State v. Fitzpatrick (1980), ____Mont.____, 606 P.2d 1343, 37 St.Rep. 194, cert. denied, ____U.S.____, 101 S.Ct. 252, 66 L.Ed.2d 118. Fitzpatrick petitioned the United States Supreme Court and was denied certiorari on the above case and on Fitzpatrick v. Sentence Review Division of the Supreme Court of Montana (1980), ____U.S.____, 101 S.Ct. 252, 66 L.Ed.2d 119.

On November 6, 1980, petitioner filed a post-conviction relief petition in District Court, Big Horn County. The State moved to dismiss, alleging that post-conviction relief, pursuant to section 46-21-101 et seq., MCA, is not available to a defendant who has been sentenced to death. The district judge denied the State's motion to dismiss on that ground, but did dismiss the petition on all claims of petitioner except as to his claim in "paragraph 8(c)" of the petition, which alleged ineffective assistance of counsel. The district judge granted petitioner leave to amend "8(c)" in order to set out his claim more specifically. On February 4, 1981, the District Court denied petitioner's request for an evidentiary hearing on the question of ineffective assistance, ruling that the allegations in the proposed amended petition were conjectural and speculative.

The State appeals from the District Court's ruling

which in effect allows post-conviction relief to persons under sentence of death. Petitioner cross-appeals from the denial of an evidentiary hearing and the denial of relief from his conviction and sentence.

The State raises one issue on appeal:

1) To what extent may a person sentenced to death challenge his conviction and sentence under Montana's Post-conviction Relief Act when he has previously been afforded a direct appeal of his conviction under the automatic review provisions of sections 46-18-307 through 46-18-310, MCA?

Petitioner raises 14 issues in his cross-appeal, which we will address as follows:

1) Does the doctrine of res judicata bar reconsideration of constitutional claims raised by petitioner on direct appeal to this Court?

2) Did the District Court err in dismissing 7 claims on their merits (discussed below) without requiring an evidentiary hearing?

3) Did the District Court err in ruling that 6 claims (discussed below) should be dismissed as a matter of law?

The district judge ruled as a matter of law that death row prisoners are not precluded from bringing a post-conviction petition pursuant to sections 46-21-101 et seq., MCA. The State argues that the automatic review provisions of section 46-18-307 through 46-18-310, MCA, take the place of the post-conviction statutes and lend the finality to review which must exist if a defendant sentenced to death is ever to have his statutory sentence imposed. Petitioner points out that the statute, on its face, declares that post-conviction relief is available to anyone "adjudged guilty of an offense." He also argues that to hold otherwise would deny petitioner the equal protection of the laws. We find petitioner's arguments persuasive.

This precise issue was raised by Dewey Coleman in his

appeal to this Court from a Rosebud County District Court's dismissal of his petition for post-conviction relief. In that appeal, decided by this Court August 28, 1981, we held that the statute is clear on its face in providing this remedy to any "person adjudged guilty of an offense." We discussed there the interest that the State has in the finality of a sentence, but we also recognized that had the legislature intended that the post-conviction statutes apply only to defendants convicted of non-capital offenses, the legislature would have expressed that intent in the statute. See Coleman v. State (No. 81-115, decided August 28, 1981.)

Based on the foregoing, we conclude that the district judge in this case properly denied the State's motion to dismiss petitioner's post-conviction relief petition.

The district judge granted the State's motion to dismiss six of petitioner's claims on the ground that the claims had been previously decided on the merits and were res judicata. Petitioner admits that the issues have been adjudicated but contends that res judicata should not apply here because:

> "(1) The Due Process clause of the Fourteenth Amendment requires greater reliability of judgments in capital cases; and (2) the previously adjudicated issues were decided incorrectly."

This Court has not specifically held that res judicata does not apply to post-conviction relief procedures but the Court did note in dictum in In re William McNair (1980), ____Mont.____, 615 P.2d 916, 917, 37 St.Rep. 1487, 1489, that in post-conviction procedures "as in habeas corpus, there is no statute of limitations, no res judicata, and . . . the doctrine of laches is inapplicable," citing Heflin v. United States (1959), 358 U.S. 415, 420, 79 S.Ct. 451, 454, 3 L.Ed.2d 407, 411 (Stewart, J. concurring) and Conners v. United States (9th Cir. 1970), 431 F.2d 1207. But despite the fact that res judicata does not prevent the bringing of repeated petitions in federal court, the doctrine

does apply insofar as it precludes inquiry into previously litigated grounds. The United States Supreme Court set out the considerations which go into determining those situations in which res judicata may preclude further litigation:

> "Where a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a § 2255 [post-conviction relief] hearing. Section 2255 provides for hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . .' In Sanders v. United States, 373 U.S. 1 (1963), we announced standards governing the determination whether a hearing should be ordered in the case of a successive motion under § 2255. Similarly, where the trial or appellate court has had a 'say' on a federal prisoner's claim, it may be open to the § 2255 court to determine that on the basis of the motion, files, and records, 'the prisoner is entitled to no relief.' See Thornton v. United States, 125 U.S. App. D.C. 114, 125, 368 F.2d 822, 833 (1966) (dissenting opinion of Wright, J.)." Kaufman v. United States (1968), 394 U.S. 217, 227, n. 8, 89 S.Ct. 1068, 1074-1075, n.8, 22 L.Ed.2d 227, 238, n.8.

The standards as set out in Sanders provide:

> "[c]ontrolling weight may be given to denial of a prior application . . . for § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." Sanders v. United States (1963), 373 U.S. 8, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148, 161.

In Coleman, supra, we approved the Sanders restrictions, holding that res judicata would apply in this State insofar as the doctrine limits relitigation of previously determined issues; but it cannot be invoked by the State so as to deprive a litigant of the right to file a successive petition, if the petitioner has a new basis or ground for coming before the court. See Coleman, supra. In the case at bar, the district judge concluded that the six previously-litigated issues should not be reconsidered. We will not disturb his finding absent a clear showing of abuse of discretion. Coleman, supra.

Seven claims set forth by Fitzpatrick in his post-

conviction relief petition were dismissed without evidentiary hearings by the District Court. We determine that an evidentiary hearing is necessary on petitioner's claim that he was denied effective assistance of counsel both at trial and at sentencing. In his petition, Fitzpatrick alleged that his court-appointed counsel failed to adequately investigate and prepare a defense, and that he was unfamiliar with critical areas of the applicable law. He cited numerous and substantial facts to support his allegations, which were found to be speculative and conjectural by the district judge.

Petitioner is entitled to have at his trial "effective assistance of counsel acting within the range of competence demanded of attorneys in criminal cases." State v. Rose (1980), ____Mont.____, 608 P.2d 1074, 1081, 37 St.Rep. 642, 649-650. From the information presented in Fitzpatrick's petition, we cannot say, as the district judge did, that "the files and records of the case conclusively show that the petitioner is entitled to no relief. . ." Section 46-21-201(1), MCA. Many of the errors of which petitioner complains involve failures of counsel to act, i.e., omissions rather than commissions, and a mere review of the record cannot show that petitioner is entitled to no relief on these grounds.

We find an abuse of discretion in the district judge's dismissal of these claims. We do not hold that petitioner was denied effective assistance of counsel, but we do find that his allegations were sufficient to require an evidentiary hearing on the issue.

The next claim set forth by petitioner is that he was denied his right to a fair and impartial jury. The district judge ruled that a hearing was not necessary on this issue, in that the claim was based only on conjecture and speculation with no basis in the record. The judge's review of the claims set forth in the petition indicate that the specific errors alleged

by petitioner narrowed down to prejudicial publicity of petitioner's previous conviction, and that one juror had sat on the previous trial of petitioner. The State contends that the jury passed muster under Irvin v. Dowd (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751.

Irvin, supra, requires that the jury render a verdict based only on the evidence presented in court. However, the Supreme Court recognized that many jurors come into court with preconceived notions based on prior publicity. This, according to the Court, does not prevent a fair trial if the jurors can lay aside these notions. Irvin, supra, 366 U.S. at 722-723, 81 S.Ct. at 1642-1643, 6 L.Ed.2d at 756.

The district judge reviewed the transcript of voir dire in this case, and determined that the publicity did not have a prejudicial effect. The jurors were questioned as a whole, and many individually, as to their attitudes resulting from the trial's publicity. The apparent result of this questioning was that nearly all jurors had heard of the case, but all agreed that they could decide the case on the evidence presented. No specific instance of a prejudiced juror was presented with the petition for post-conviction relief. This Court will not presume prejudice; it is incumbent on defendant to bring specific evidence of prejudice before the Court. State v. LaMere (1980), ____ Mont.____, 621 P.2d 462, 465, 37 St.Rep. 1936, 1940.

Petitioner also alleges error in that one juror had served on his first jury. This reference to an earlier trial came out when jurors were being questioned as to knowledge of any witnesses. The questions show that one juror—who was eliminated from sitting in this trial—had been a juror in the trial of Gary Radi, a codefendant of Fitzpatrick; she had not been involved in Fitzpatrick's first trial. The fact that there was an earlier trial of Fitzpatrick was clearly before the jury, and the State questioned the jurors as to the effect of this

- 7 -

information. Individual jurors expressed concern for the problems of possible prejudice from knowing that Fitzpatrick had been previously tried, but no juror expressed the view that he or she could not make an impartial decision. And again, petitioner sets forth no facts showing actual prejudice existing in any one juror. What he wanted the court to do, according to the district judge, was to "pierce the veil of the jury deliberations" to try to find that the decision was based on bias and prejudice. Such an inquiry is not proper in this case. See State v. O'Brien (1907), 35 Mont. 482, 503, 90 P. 514, 521; McDonald v. Pless (1914), 238 U.S. 264, 267-269, 35 S.Ct. 783, 784-785, 59 L.Ed 1300, 1302-1303.

We find that the district judge properly denied an evidentiary hearing on this issue. No evidence presented to the court showed any bias or prejudice existing in the jury verdict.

The next issue which requires an evidentiary hearing, according to petitioner, is that of whether petitioner was denied meaningful appellate sentence review. He contends that this Court, in its review of his sentence pursuant to section 46-18-307, MCA, failed to look at the transcript of the sentencing hearing. He also faults this Court for not considering the evidence submitted by petitioner, which set out a compilation of sentences imposed for crimes committed throughout the State. Based on the foregoing, he claims that his sentence should be overturned for being arbitrary and disproportionate.

The State argues that petitioner received meaningful review through the Court's comparison of petitioner's sentence with that of other capital defendants. See State v. Fitzpatrick, supra, _____ Mont. at _____, 606 P.2d at 1361-1363, 37 St.Rep. at 217-218. Such a comparison is sufficient, according to the State. We agree and find that our review of petitioner's sentence was sufficient.

The Montana Codes require this Court to automatically

- 8 -

review the imposition of a death sentence. Section 46-18-307, MCA. The Court is required to look at the following factors in determining the propriety of the death sentence:

> "(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> "(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 46-18-303 and 46-18-304; and
>
> "(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration." Section 46-18-310, MCA.

Petitioner does not attack the statutes, but rather disputes that this Court adequately considered the proportionality of his sentence. He directs us to the language of the United States Supreme Court in Gregg v. Georgia (1976), 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859, 888, wherein the Court set forth the importance of appellate review in

> "compar[ing] each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate."

The district judge who considered the petition for post-conviction relief noted in his findings:

> "The Court [Montana Supreme Court] considered the only two Montana cases involving aggravated kidnapping resulting in the death of the victim, and found that the defendant's case was not excessive or disproportionate to the penalty imposed in similar cases. The Court noted that its comparison of cases was limited to an examination of McKenzie and Coleman, as they are the only cases arising in Montana since the effective date of the aggravated kidnapping statute."

We noted in our first review of petitioner's sentence, as did the district judge, that there were few comparable cases, but that our review procedure encompassed those cases. Such a comparison is adequate. See Gregg, supra, 428 U.S. at 204, n. 56, 96 S.Ct. at 2940, n. 56, 49 L.Ed.2d 892, n. 56; Proffitt v. Florida (1975), 428 U.S. 242, 259, n. 16, 96 S.Ct. 2960, 2970, n.

16, 49 L.Ed.2d 913, 927, n. 16; Spinkellink v. Wainwright (5th Cir. 1978), 578 F.2d 582, 604-606; cert. denied 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796; State v. Coleman (1979), ____Mont. ____, 605 P.2d 1000, 1020-1021, 36 St.Rep. 1134, 1155-1156, cert. denied, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831. The compilation of data submitted by petitioner from other district courts in the State was not relevant to our sentencing inquiry. The data did not include cases comparable to McKenzie, Coleman, or the instant case, which formed the basis for our consideration. It was not error to consider only these cases.

We also dispute petitioner's allegation that this Court did not review the transcript from the sentencing hearing. The district judge correctly noted that "the Montana Supreme Court directed the District Court to transmit the transcript of the sentencing proceedings in this cause." The record of that hearing was before us, and was considered by this Court in reviewing the sentence. There was no error.

Petitioner next claims that his sentence was imposed arbitrarily and discriminatorily, and that an evidentiary hearing was necessary in order to elicit the facts to show that arbitrary sentencing exists in Montana. He also contends that the statutes apply discriminatorily against "impoverished male defendants accused of killing caucasians," and thus are violative of his Eighth and Fourteenth Amendment rights. The district judge held that the statutes are constitutional, as drawn, based on our decisions in McKenzie, supra, Coleman, supra, and on Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. He further found that petitioner had not alleged sufficient facts to require an evidentiary hearing on the question of discriminatory sentencing. We agree.

The death penalty statutes, as drawn, were enacted to cure the arbitrariness that was found to be inherent in the Georgia statutes, as identified in Furman, supra. See State

- 10 -

v. McKenzie (1978), 177 Mont. 280, 318, 581 P.2d 1205, 1227,

A later Georgia statute, and one similar to Montana's, was found to preclude arbitrary and capricious sentencing. The Supreme Court noted in Gregg, supra, 428 U.S. 195, 96 S.Ct. at 2935, 49 L.Ed. at 887, that the concerns for arbitrariness can be met "by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."

The Florida statute was found to be constitutional on its face by the same court in Proffitt, supra:

> "Under Florida's capital-sentencing procedure, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is '"no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."' Gregg v. Georgia, at 188, 49 L Ed 2d 859, 96 S.Ct. 2909, quoting Furman v. Georgia, 408 U.S., at 313, 33 L Ed 2d 346, 92 S.Ct 2726 (White, J., concurring). On its face the Florida system thus satisfies the constitutional deficiencies identified in Furman." Proffitt, supra, 428 U.S. at 253, 96 S.Ct. at 2967, 49 L.Ed.2d at 923.

See also Spinkellink, supra, 578 F.2d at 604-606, which interprets the United States Supreme Court decision in Proffitt, supra, to mean that by instituting sentencing procedures which focus on the character of the defendant and the circumstances of the crime, the arbitrariness is conclusively removed from sentencing and no case by case review need be made on this question.

The Montana sentencing statutes are likewise drawn so as to prevent arbitrary sentencing. We reaffirm our holding that they are constitutional. McKenzie, 177 Mont. at 320, 581 P.2d at 1228-1229; Coleman, ____ Mont. at ____, 605 P.2d at 1015-1017, 36 St.Rep. at 1148-1151.

As to the claim that the death penalty statutes are discriminatory, we find the reasoning of the Fifth Circuit in Spinkellink, supra, to be persuasive. That court discussed the

cases of Washington v. Davis (1976), 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, and Village of Arlington Heights v. Metropolitan Housing Development Corp. (1977), 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, and noted that disproportionate impact of a facially neutral law will not make the law unconstitutional, unless a discriminatory intent or purpose is found. Spinkellink, supra, 578 F.2d at 614-616, and footnote 42. The Montana law is facially neutral, and petitioner makes no allegations that the law has a discriminatory intent. Further, the district judge here held that petitioner set forth no facts showing any evidence of discriminatory application of the statutes. See Coleman, _____ Mont. at _____, 605 P.2d at 1019, 36 St.Rep. at 1153.

Finding that no evidence was presented which required a further factual hearing, the district judge properly dismissed petitioner's claim.

Petitioner alleges that the death penalty is imposed so rarely that it does not deter and serves no legitimate state interest. He contends that this is a factual issue which demanded that the judge grant an evidentiary hearing. The State contends that this is a legal issue, and further, that petitioner presented nothing but vague opinions and conclusions on this issue.

In assessing penalties under the Eighth Amendment, the Supreme Court has determined that the death penalty is not per se cruel and unusual. Gregg, 428 U.S. at 169, 96 S.Ct. at 2923, 49 L.Ed.2d at 872. The Court further noted that "inhumane" punishment is forbidden, as is punishment which does not suit the crime. In making these determinations, the Court will look to "objective indicia that reflect the public attitude toward a given sanction," because an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment. Public perceptions are not conclusive, but if a penalty also accords "with the dignity of man," the punishment will be upheld. Gregg, 428 U.S. at

- 12 -

169-173, 96 S.Ct. at 2923-2925, 49 L.Ed.2d at 872-875.

The district judge found it indicative of public attitude that the electorate of Montana voted in 1972 to retain capital punishment. In addition, the State points out that the legislature has continued throughout the 1970's to make Montana's death penalty statutes conform to the requirements of the United States Supreme Court. Also the State notes that the 1981 legislature rejected an attempt to change the penalty to a different means of inflicting death (other than hanging), which reflects the fact that the legislature still sees death by hanging as legitimate, and not so rare to have no application to deterrence. In Gregg, supra, the Supreme Court noted that there is not significant evidence either supporting or opposing capital punishment as a deterrent. For that reason, the Court determined that the issue was better left to State legislatures, which could evaluate the effects in their own states better than the courts could. Gregg, 428 U.S. at 184-187, 96 S.Ct. at 2931, 49 L.Ed.2d 881-882.

In sum, the State appears to have retained a legitimate interest in capital punishment. Indeed, it is invoked rarely, but few crimes reach the levels where such punishment is even considered. In an area such as this one, which is left to the State legislatures for a factual determination, the district judge correctly dismissed petitioner's claim.

A final issue which petitioner argues was one demanding an evidentiary hearing was whether death by hanging constitutes cruel and unusual punishment. He argues that death by hanging is slow and painful, and that because so few people are hanged, there are no competent hangmen in Montana.

We have not determined that any particular means of punishment offends the constitutional provision against cruel and unusual punishment. Thus we shall defer to the legislature in this matter. See State v. Coleman (1979), ____Mont.____, 605

- 13 -

P.2d 1000, 1058-1059, 36 St.Rep. 2237, 2247. The district judge properly dismissed this claim.

Petitioner next raises six issues which he alleges the district judge decided incorrectly on the merits. Because these issues involve questions of law and not of fact, both sides agreed that an evidentiary hearing on these issues was not necessary.

In "paragraph 8(e)" of his petition for post-conviction relief, petitioner alleges that he was denied his constitutionally-required unanimous jury verdict because the jury was instructed on the crimes in the disjunctive, e.g.:

> " . . . it was allowed to convict if it found he 'purposely or knowingly performed, or aided or abetted in performing, the acts causing the death . . . or . . . the death . . . was caused while [he] was engaged in or was an accomplice to the commission of, or flight after . . . robbery or kidnapping.'" (Instruction No. 24.) (Emphasis added by petitioner.)

With this type of instruction, petitioner argues, 12 people may never have agreed on exactly which crimes were committed. The State argues that the jury instructions also told the jury that all 12 of them had to agree, and further, that the district judge found substantial evidence to support all alternatives.

Petitioner cites the case of United States v. Gipson (5th Cir. 1977), 553 F.2d 453, in which a federal defendant was convicted of "selling" or "receiving" pursuant to 18 USC § 2313. That statute provided that the defendant should be convicted if he did one of the enumerated acts: receiving, concealing, storing, bartering, selling, or disposing. The court found that these six acts fell into two groups, which are conceptually different. The court held that there could not be a unanimous verdict if some jurors found defendant guilty of an act in the other group. The verdict lacked unanimity of the "actus reus." Gipson, 553 F.2d at 457-459. This case is clearly distinguishable. While the jury in Gipson was deliberating, they asked the

- 14 -

judge if they could convict if all 12 of them did not agree to the specific act done, i.e., one of the six statutory acts. The judge answered in the affirmative. No such event occurred here. The jurors were specifically instructed that all 12 had to agree in order to convict.

Petitioner also cites a recent Washington case, State v. Green (1980), 94 Wash.2d 216, 616 P.2d 628, in which the Washington Supreme Court reversed a guilty verdict, citing nonunanimity of the jury verdict. That case involved a jury instruction that "defendant caused the death of [victim] in the course of or in furtherance of rape in the first degree or kidnapping in the first degree." The jury found only that defendant was guilty of aggravated murder. The court reversed, finding that it was impossible to determine whether the jury unanimously agreed that defendant committed either rape or kidnapping, and ruled that there was not substantial evidence to support kidnapping. The court noted that rape and kidnapping are separate and distinct criminal offenses and must be proved as to all elements because one of these offenses is necessary to sustain the more serious offense, i.e. aggravated murder in the first degree. State v. Green (1980), 94 Wash.2d 216, 616 P.2d at 637-638.

We find no error under the facts of this case. The jury was instructed as to the requirement of a unanimous verdict, which many courts have found to be sufficient. The Second Circuit, in upholding a verdict of guilty on a conspiracy charge which the jury could have determined to have been committed in several ways, noted:

> " . . . '[I]t is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.' United States v. Natelli, 527 F.2d 311, 325 (2d Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175." United States v. Murray (2d Cir. 1980), 618 F.2d 892, 898.

Moreover, a review of the transcript satisfies us,

as it did the district judge, that there was substantial evidence to support all of the alternatives set forth in the instructions. See State v. Arndt (1976), 87 Wash.2d 374, 553 P.2d 1328, 1330. See also, State v. Souhrada (1949), 122 Mont. 377, 385, 204 P.2d 792, 796. Therefore we find that the requirement of unanimity, as guaranteed by the Montana Constitution, was satisfied.

Petitioner claims that he was denied his rights under the Sixth, Eighth and Fourteenth Amendments by reason of the fact that a jury was not involved in the sentencing determination. The district judge determined that this issue had been decided adversely to petitioner by implication in this Court's decisions in Coleman and McKenzie. We agree.

The United States Supreme Court has not required that the fact-finding leading to sentencing be done by a jury. That Court has said that a jury provides "a significant and reliable objective index of contemporary values," Gregg, 428 U.S. at 181, 96 S.Ct. at 2929, 49 L.Ed.2d at 879, but the Court also upheld the Florida sentencing scheme whereby a jury was advisory only, with the judge making the final determination. In Proffitt, supra, 428 U.S. at 252, 96 S.Ct. at 2966, 49 L.Ed.2d at 922-923, the Court stated:

> "The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 N. 15, 20 L.Ed.2d 776, 88 S.Ct. 1770, 46 Ohio Op.2d 368 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

Although in the later case of Lockett v. Ohio (1978), 438 U.S. 586, 609, n. 16, 98 S.Ct. 2954, 2967, n. 16, 57 L.Ed.2d 973, 992, n. 16, the Supreme Court reserved judgment on whether

the Constitution required a jury to determine death penalty sentencing, the decision in _Proffitt_ convinces us that at this time the Montana statutory scheme is constitutional. What appears to be of overriding importance is that the trial and sentencing are bifurcated, with different factors considered at each. _Gregg_, 428 U.S. at 190-192, 96 S.Ct. at 2933-2934, 49 L.Ed 2d at 884-885.

Petitioner points out that Montana and Idaho are now the only states which take the factual matters involved in sentencing away from the jury. Oregon recently struck down its statute, finding that judicial sentencing was unconstitutional. That case is distinguishable: in order for the death sentence to be imposed, the judge, not the jury, had to determine that the murder was deliberate, thereby giving the judge the task of determining one of the elements of the crime. See State v. Quinn (1981), 290 Or. 383, 623 P.2d 630, 639-644.

The Montana situation is not analogous. The factors to be considered by the judge in imposing the death penalty are not elements of the crime. See sections 46-18-303 and 46-18-304, MCA. The Montana scheme is more like an "enhanced penalty statute," which the Oregon Court agreed was a permissible situation in which to deny the input of a jury. The court found that "the facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing court." _Quinn_, 623 P.2d at 643. See also State v. Stewart (1977), 175 Mont. 286, 299-300, 573 P.2d 1138, 1145-1146.

The district judge was correct in determining that petitioner's claim should be dismissed. There is no constitutional requirement that a jury make the determination to impose the death penalty.

Petitioner next alleges error in that he was required to prove that his life should be spared, because the burden rests on him to show mitigation. The State points out that this Court

has upheld the Montana sentencing procedures in <u>Coleman</u> and <u>McKenzie</u> and that the statutes conform with the United States Supreme Court's guidelines.

As the district judge recognized, the United States Supreme Court has declined to decide the constitutionality of "requir[ing] defendants to bear the risk of nonpersuasion as to the existence of mitigating circumstances in capital cases." <u>Lockett</u>, 438 U.S. at 609, n. 16, 98 S.Ct. at 2967, n. 16, 57 L.Ed.2d at 992, n. 16. He also noted that the cases relied on by petitioner in support of his position all relate to the <u>guilt</u> phase of prosecution, in which the burden is necessarily on the State to prove every element of the crime. In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; State v. Stewart, 175 Mont. at 299-301, 573 P.2d at 1145-1146. See also State v. Pierre (1977), ____Utah____, 572 P.2d 1338, 1346-1347, cert. denied 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194.

This is an issue of first impression in Montana, with regard to the death penalty statutes. Section 46-18-305, MCA, provides that "the court . . . shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." This statute undoubtedly places the burden on the defendant to show that his life should be spared, but we find this to be constitutionally permissible. In State v. Stewart, supra, we discussed the United States Supreme Court case of Patterson v. New York (1977), 432 U.S. 197, 97 S. Ct. 2319, 53 L.Ed.2d 281, noting that <u>Patterson</u> relieves the State of the burden of proving facts which do not constitute elements of the crime. We stated in <u>Stewart</u> that it is permissible to allow facts pertinent only to the question of punishment to be determined by a judge rather than by the jury, and the State need not prove such facts beyond a reasonable doubt:

> "Here, we are concerned with a statute having a bifurcated sentencing provision rather than a

- 18 -

> statute that separately allocates the burden of proof, as in Patterson. However, the present case and Patterson, both, focus on the status of a fact neither by tradition nor by statute a necessary element of the crime charged. The majority decision and Justice Powell's dissent in Patterson indicate that when the presence or absence of such a fact determines only the severity of punishment, it need not be proved by the state beyond a reasonable doubt. The release or nonrelease of a kidnapper's victim is such a fact, and it is within the power of the state to allow the trial court, rather than the jury, to make this factual determination." State v. Stewart, 175 Mont. at 301, 573 P.2d at 1146.

The mitigating factors in the death penalty statutes have no bearing on guilt or innocence. Thus it is permissible to require the defendant to bring forth the evidence pertinent to the question of mitigation.

The next alleged error raised by petitioner is that the death penalty is violative of petitioner's constitutional rights because the death penalty is disproportionate to the crime of kidnapping, and the penalty was imposed here without a finding by the jury that petitioner deliberately took a life. Petitioner cites Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, and Eberheart v. Georgia (1977), 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104, for the holdings that the death penalty cannot be constitutionally imposed for rape or kidnapping.

The State argues that these cases are inapplicable because this case involves a death that is the result of an aggravated kidnapping, section 46-18-303(7), MCA, which is clearly distinguishable from the kidnapping involved in Eberheart, supra. We agree.

The United States Supreme Court has ruled that the death penalty is permissible for the crime of homicide when a life has been deliberately taken by the defendant. Gregg, supra. But that Court has reserved judgment on whether more than a delibicerate act which results in the taking of a life is necessary in imposing the death penalty, i.e., whether there must be a speci-

fic purpose to take the life of the victim. Lockett, 438 U.S. at 609, n. 16, 98 S.Ct. at 2967, n. 16, 57 L.Ed.2d at 992, n. 16.

This Court found in Fitzpatrick, ___Mont. at ____, 606 P.2d at 1356, 37 St.Rep. at 209, that "[d]efendant purposely kidnapped, robbed, and caused the death of Monte Dyckman." There was no finding of a specific intent to kill. Thus, petitioner argues, his death sentence may have been imposed for a death which resulted from the commission of a felony, or for his role only as an aider or abettor.

Justices White and Marshall concurred in Lockett, supra, but condemned the imposition of the death penalty in felony murder situations. They pointed out that about half the states have foreclosed the death penalty for those who do not specifically intend death, finding the penalty grossly out of proportion for any other crime, and having little deterrent value in these situations. Lockett, supra, 438 U.S. at 619-621, and 624-628, 98 S.Ct. at 2972-2974 and 2983-2985, 57 L.Ed at 998-1000, and 1002-1004.

The legislature in Montana has not seen fit to foreclose this sentence for the intentional crime of aggravated kidnapping which results in death. Section 46-18-303(7), MCA. We do not find the death penalty to be disproportionate to the crime committed here, and we will defer to the legislature where we find no constitutional violation.

Petitioner further objects to the imposition of sentence based on a judge's findings, rather than a jury's. As we indicated, supra, we find it constitutionally permissible to give the sentencing judge the discretion to make the factual findings which form the basis for the death sentence. State v. Stewart, 175 Mont. at 301, 573 P.2d at 1146. Since there is no constitutional requirement for a finding of a specific intent to kill, it is permissible for the sentencing judge to impose the death penalty in this case in which the jury found a deliberate act by

petitioner and the judge made the findings relevant to imposition of the death penalty.

In "paragraph 9(g)" of his post-conviction petition, petitioner contends that he was sentenced on erroneous information and constitutionally impermissible evidence. The district judge dismissed the claim. We find that he was correct in doing so.

Petitioner claims that there was no evidence to support the findings of the sentencing judge that the killing was committed by "lying in wait or ambush," and that the crime of kidnapping had resulted in the death of the victim. Section 46-18-303, MCA. This Court had the sentencing file and the trial transcript before it on the last appeal, but this issue was not specifically raised. However, at that time, we reviewed the sentence, as we were compelled to do, section 46-18-307, MCA, and found that "the evidence in the record clearly proves sufficient aggravating circumstances exist in this case to warrant imposition of the death penalty." Fitzpatrick, ____ Mont. at ____, 606 P.2d at 1360, 37 St.Rep. at 215. We need not review this issue further.

Petitioner also claims that the sentence was based partially on a constitutionally infirm conviction. Petitioner had been convicted of murder prior to this case, but the conviction was overturned because of inadequate counsel and lack of speedy trial. The sentencing judge noted that under Burgett v. Texas (1967), 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319, the Court should not consider convictions which are constitutionally infirm because of Gideon violations. The record from sentencing indicates that the judge was well aware that he should not consider this, and he so stated:

> "The reversal of this conviction nullifies this incident as evidence in aggravation, but is nevertheless material in demonstrating that the defendant's conduct in prison is not a source of mitigation with respect to the sentencing issue . . ." Court's Finding (f).

This Court determined in State v. Olsen (1980), ____Mont.
_____, 614 P.2d 1061, 37 St.Rep. 1313, that a defendant is
entitled to a conviction based on substantially correct
information, and that infirm convictions should not be
considered. However, this Court also stated in that opinion that
if it is obvious from the record that the judge did not rely on
that conviction, and that the sentence would not have been dif-
ferent had the judge disregarded that prior conviction totally,
the Court will find no prejudice to the defendant. The Olsen
Court also noted that in view of that defendant's extensive cri-
minal background, a look at those past convictions is not
prejudicial. State v. Olsen, ____Mont. at ____, 614 P.2d at
1064-1065, 37 St.Rep. at 1316-1317. Petitioner here had a
substantial record.

Here the judge declared that he could not and would not
rely on the prior conviction. We find this to be sufficient to
safeguard petitioner's interest in an appropriate and constitu-
tional sentence.

Petitioner disputes one other item apparently considered
by the judge in sentencing: that defense counsel informed the
court that petitioner had admitted to the homicide of which he
had previously been convicted, but claimed self-defense.
Petitioner asserts now that he had no involvement in that
offense. This issue is not discussed in his brief, but appears
to refer to the conviction, discussed above, which was disre-
garded by the judge. As we noted, we find no error in the sen-
tencing judge's treatment of that conviction.

Next, petitioner challenges his sentence on the basis of
the allegedly vague guidelines used in finding aggravating and
mitigating circumstances. He asserts that they allow too much
discretion in sentencing, which injects unconstitutional
arbitrariness into death penalty decisions. The State counters
by pointing out that certain factors similar to those set out in

the Montana statutes (sections 46-18-303 and 46-18-304, MCA) have been found to be constitutional in Gregg, 428 U.S. at 165, n. 9, 96 S.Ct. at 2921, n. 9, 49 L.Ed.2d at 870, n. 9; in Proffitt, 428 U.S. at 248, n. 6, 96 S.Ct. at 2965, n. 6, 49 L.Ed.2d at 921, n. 6; and in Jurek v. Texas (1976), 428 U.S. 262, 265, n. 1, 96 S.Ct. 2950, 2953, n. 1, 49 L.Ed.2d 929, 934-935, n. 1. Also, this Court has specifically upheld the Montana statutes in McKenzie and Coleman, supra, in light of the United States Supreme Court decisions.

Since these cases have been decided, the United States Supreme Court has criticized the Georgia Court's interpretation of one factor set out in the Georgia statute. The Supreme Court found that the Georgia Court had adopted such a broad construction of their statutory aggravating circumstance of "outrageously or wantonly vile, horrible or inhuman in that it involved torture," that sentencing had become arbitrary and capricious. That Court noted the necessity of having "'clear and objective standards,'" which provide "'specific and detailed guidance,'" allowing for rational review of the imposition of the death sentence. Godfrey v. Georgia (1980), 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-1765, 64 L.Ed.2d 398, 406.

The Montana statutes do not contain the provision which was relied on by the Georgia Court in imposing a death sentence. But more importantly, we note that the Montana statutes have been upheld by this Court as being facially sufficient to withstand an attack of arbitrariness. And we find no evidence that the application of the factors set out in the death penalty statutes has been so broad that there is no longer "any inherent restraint on the arbitrary and capricious infliction of the death sentence." Godfrey, supra. Despite the fact that "lying in wait," and "significant history of prior criminal activity," sections 46-18-303, 46-18-304, MCA, have not been previously defined by this Court and were not elaborated upon during sentencing, we

find no error in the findings of the sentencing judge that the factors applied in this case.

We noted previously that the evidence supports the finding that the homicide was committed by "lying in wait," as was found by the district judge. The evidence shows that the robbery was contemplated well in advance of the events which led to the killing of Monte Dyckman, and that immediately before the robbery petitioner sat in his car watching the Safeway Store and then the drive-in bank, waiting for the victim. It also shows that of all the participants in the crime, petitioner was the one who made the decision to escalate the crime to murder and he fired the shots at the victim. Although the petitioner may or may not have actually pulled the trigger while "lying in wait," the entire chain of events leading to the homicide came as a result of lying in wait. Whereas the mischief found by the Supreme Court in Godfrey, supra, was that "a person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman,'" because there is nothing in those "few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence," Godfrey, supra, 446 U.S. at 428, 100 S.Ct. at 1765, 64 L.Ed.2d at 406, such a criticism cannot be made about the term "lying in wait." It can apply in but few circumstances and it is not subject to the abuse noted in Godfrey. The words themselves contain their own restraint, they have not been applied to allow standardless and unchanneled sentencing, and they are not unconstitutionally vague.

For the same reasons, petitioner disputes the judge's finding that he had a "significant history of criminal activity." Section 46-18-304, MCA. Again, this phrase has not been defined by this Court, but we find that it is particular enough by its own terms to prevent allegations of vagueness and to allow for rational review of the sentence. We set out defendant's prior

criminal history in the previous appeal of this case.  See
_Fitzpatrick_, ____Mont. at ____, 606 P.2d at 1360-1361, 37 St.Rep.
at 216.  By any stretch of the imagination, his past activity is
"significant," and this finding by the judge was clearly within
the bounds of the statute.  It would be frivolous to attempt to
define that phrase in a case such as this.  Petitioner's argument
is totally without merit.

One further issue in this case deserves comment, although
it was not raised by petitioner or the State in the original
proceedings.  Since the time of argument of this case, the United
States Supreme Court has decided the case of Bullington v.
Missouri (1981), ____U.S.____, 101 S.Ct. 1852, 68 L.Ed.2d 270,
which petitioner argues requires a reversal of his death sentence
on the charge of deliberate homicide.

In _Bullington_, the defendant was tried for murder, and was
sentenced to life imprisonment.  His conviction was later set
aside by reason of a Supreme Court decision, and defendant was
scheduled to be retried on the same charge.  The prosecution
notified the defense that the State would seek the death penalty.
The defendant argued that the double jeopardy clause of the Fifth
Amendment precluded imposition of the death penalty in a second
trial when the first sentencing jury had declined to impose the
death penalty.  Petitioner here makes the same argument, pointing
to the fact that the sentencing judge refused to impose the death
penalty for deliberate homicide following the first conviction,
but that it was imposed on that charge after retrial.  (The death
penalty was imposed for the crime of aggravated kidnapping
following both trials; that sentence is not being challenged on
this particular ground.)

The United States Supreme Court agreed with the defendant
in _Bullington_ because of the nature of the Missouri sentencing
procedure.  While reaffirming the holding that the double
jeopardy clause "imposes no absolute prohibition against the

imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside," the Court noted that such a prohibition does exist if the sentencing proceeding has "the hallmarks of the trial on guilt or innocence." Bullington, ___ U.S. at ___, 101 S.Ct. at 1857-1858, 68 L.Ed.2d at 278-279.

In all respects the Missouri sentencing procedure resembles a trial on the question of guilt or innocence. The State is required to prove beyond a reasonable doubt the facts on which the sentence is based. Additionally, as the Court noted:

> "At the statutorily-prescribed presentence hearing, counsel make opening statements, testimony is taken, evidence is introduced, the jury is instructed, and final arguments are made. The jury then deliberates and returns its formal punishment verdict. § 565.006.2 See n. 4, supra. All these steps were taken at petitioner's presentence hearing following his first trial.

> "We think it not without some significance that the pertinent Missouri statute itself speaks specifically of the presentence hearing in terms of a continuing 'trial.' Section 565.006.2 states that after the verdict of guilty of capital murder is returned, 'the court shall resume the trial and conduct a presentence hearing.' (Emphasis added.)" Bullington, ___ U.S. at ___, 101 S.Ct. at 1858, n. 10, 68 L.Ed.2d at 279, n.10.

Further, the Court found it significant that the sentencing jury was given but two choices in imposing the sentence for capital murder: death or imprisonment without eligibility for probation or parole for 50 years. By not imposing death, the jury was in effect "acquitting" the defendant of what was necessary to impose a death sentence, and the double jeopardy clause forbids retrial of a defendant who has been acquitted of a crime charged. Bullington, supra.

The Montana sentencing procedure is radically different from the procedure in Missouri. Here the sentencing hearing is clearly separate from the trial, and it is far removed from a mere continuance of the trial on guilt or innocence. See section 46-18-301, MCA. Sentencing is done by the court, not by a jury. Facts forming the basis for the sentence imposed do not have to

be proved beyond a reasonable doubt. Additionally, the sentencing judge, although subject to specific guidelines in making the decision to impose a death sentence, has wider discretion in imposing a sentence other than death. Section 46-18-305, MCA. In sum, we do not find that the Montana statutes, unlike the Missouri statutes, require the State to "prove its case" as to one punishment, thus "acquitting" a defendant on other possible punishments. Thus we reject petitioner's argument that his sentence should be vacated.

Based on the foregoing, we affirm the District Court except as to its ruling on effective assistance of counsel. We remand to the District Court for an evidentiary hearing on petitioner's claims that he had ineffective assistance of counsel at trial and at sentencing.

Chief Justice

We concur:

Justices

Hon. W. W. Lessley, District
Judge, sitting in place of Mr.
Justice John C. Sheehy

Mr. Justice Daniel J. Shea and Mr. Justice Frank B. Morrison, Jr. dissent and will file written dissents later.

- 27 -

IN THE SUPREME COURT OF THE STATE

OF MONTANA


No. 81-74

--------------------------------
                              *
STATE V. FITZPATRICK           *
                              *
--------------------------------


Dissent of Mr. Justice Daniel J. Shea


DATED: OCT 30 1981

FILED

OCT 3 0 1981

Thomas J. Kearney
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

Assuming no other error, I agree with the majority
that this case must be remanded to the trial court for an
evidentiary hearing on the competency of counsel issue.
However, trial error requires that all three convictions be
reversed and a new trial granted. Further assuming that no
trial error required reversal, I am convinced that the trial
court committed error with relation to imposition of the
death penalty for the crimes of deliberate homicide and
aggravated kidnapping. This error would require in any event
that the case be remanded to the trial court for resentencing
with instructions that the trial court not consider the death
penalty as one of its options. I am convinced, furthermore,
that this Court has denied meaningful appellate review to
Fitzpatrick, not only with relation to the death penalty issues,
but also with relation to the allegations of trial error.

I emphasize from the outset, just as I emphasized in
State v. Coleman (Coleman III) (Decided August 28, 1981,
38 St.Rep. 1352), that although the majority claims to have
adopted the standards set forth in Sanders v. United States
(1963), 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, for purposes
of analyzing possible res judicata issues, the majority has
totally failed to adhere to the three part test set out in
Sanders. In one breath, the majority has adopted the test
and the next breath the majority has ignored the test, thereby
effectively rejecting the rules purportedly adopted.

If Sanders means anything, it means that an appellate
court must set forth the issue and apply the three-part test
in deciding whether a claim is barred by res judicata. Under
Sanders, we are required first to determine whether the issue
was previously litigated, second, whether the issue was decided

-28-

on the merits, to determine whether justice may require a reexamination of that issue. In other words, we must determine whether we want to reexamine an issue because of doubt as to whether it was _properly_ decided. Needless to say, the majority totally ignored _Sanders_ in _Coleman III_, and on several issues raised here the majority also has totally ignored _Sanders_.

Contrary to the majority statement, _Sanders_, quoted in both _Coleman III_ and _Fitzpatrick III_, does not absolutely bar relitigation of previously determined issues. Rather, it bars them only if the issue has been previously determined _on the merits_, _and_ if the appellate court is convinced that the issue has been _properly decided_. 373 U.S. 8, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148, 161.

The following language of the majority opinion rejects the _Sanders_ tests rather than adopting them as claimed:

> "In _Coleman_, supra, we approved the _Sanders_ restrictions, holding that res judicata would apply in this State insofar as the doctrine limits relitigation of previously determined issues; but it cannot be invoked by the State so as to deprive a litigant of the right to file a successive petition, if the petitioner has a new basis or ground for coming before the court. See _Coleman_, supra.. . ." (Emphasis added.)

Obviously the meaning of _Sanders_, although purportedly adopted, has had no impact on the majority. A most casual look at the three-part test of _Sanders_ by a first year law student would reveal that _Sanders_ bars reconsideration of issues already decided if they have been decided on the merits and if decision on the merits was correct.

The failure of this Court to properly apply the _Sanders_ criteria in _Coleman III_, and now in _Fitzpatrick III_, demonstrates beyond doubt that we cannot provide meaningful appellate review to these death penalty cases. Once again it will fall upon a

federal court to tell this Court that we have not even followed the rules we claimed to have adopted and followed. These death penalty cases further illustrate the vital necessity that the federal courts be the final arbiter of these issues. Too often the state courts, for reasons I do not fully comprehend, fail to grant a defendant the full spectrum of rights to which he is entitled.

PART A: THE MAJORITY HAS FAILED TO ADHERE TO SANDERS V. UNITED STATES IN FAILING TO MENTION ISSUES ALREADY DECIDED, BUT WHICH PETITIONER CLAIMS WERE ERRONEOUSLY DECIDED

In his petition for post-conviction relief, and in his appellate briefs, Fitzpatrick has again raised several issues concerning the conduct of the trial, which, although already decided, he claims were erroneously decided. He contends that res judicata does not control these issues because the Due Process Clause of the Fourteenth Amendment requires greater reliability of judgments in capital cases, and that the previously adjudicated issues were decided incorrectly.

Even though this Court has now committed itself to the three-part analysis of Sanders in determining whether res judicata controls an issue already decided, as in Coleman III, we have again departed from Sanders in almost the same breath that we have adopted its three-part test. Nowhere does the majority opinion mention certain issues raised by Fitzpatrick that he contends were wrongly decided in Fitzpatrick II (1980), ____ Mont. ___, 606 P.2d 1343, 37 St.Rep. 194. Minimum adherence to Sanders requires that this Court at least mention the issues raised, and then determine whether they were decided on the merits, and then determine whether they were correctly decided on the merits.

Specifically, Fitzpatrick contends that "the jury was improperly instructed on the State's burden of proof contrary

-30-

to the ruling in Sandstrom v. Montana (1979), 442 U.S. 510, in that "hearsay evidence relied upon by the State to obtain this conviction was too unreliable to support a conviction and death sentence, i.e., the unsworn extra-judicial statements allegedly made by Gary Radi " and that other admited evidence was irrelevant and prejudicial, i.e., opinion testimony·of the Sheriff as to the location of an allegedly hidden gun, a knife which was never connected to petitioner, a shell casing and ski mask which were never related to Petitioner." Respondent's brief, at 9-10.

Fitzpatrick attacks in particular the testimony of accomplice Bushman who was permitted to testify that another co-conspirator, Gary Radi, had stated when Fitzpatrick was not present  that Fitzpatrick had shot and killed Monte Dyckman. He argues that the evidence was not admissible under any Montana evidence rules because Radi, at the time the hearsay was admitted, had not provided any inconsistent testimony within the meaning of Montana Evidence Rule 801(d) (1)(A), nor was there a finding or evidence, at that point, that the statement was made during the course of and in furtherance of a conspiracy under Montana Rules of Evidence 801(d)(2)(E). Without this foundation, he contends the testimony could not be admitted. In addition, he claims that even with this foundation the testimony was inadmissible because it violated his right to confrontation.

Fitzpatrick argues that the record is "void of any suggestion that the State made any effort to call witness Radi "as a witness for the State and endeavor to elicit his evidence directly from his lips under oath and in the presence of the jury." He cites Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv.L.Rev. 567, 577 (1978), and then contends that the State not having

done so, Radi failed to testify to the underlying facts, as required by Nelson v. O'Neill (1971), 402 U.S. 622, 629, 91 S.Ct. 1723,/ 29 L.Ed.2d 222, 228. He therefore claims that Fitzpatrick "was clearly denied his right to confront witnesses guaranteed him by the Sixth Amendment to the United States Constitution."

He further argues that admission of this hearsay evidence calls into question the reliability of the jury's verdict and therefore the death penalty cannot be imposed.

I have doubts concerning the admissibility of accomplice Bushman's testimony repeating what another accomplice, Gary Radi, had stated to him--namely, that Fitzpatrick had shot and killed Monte Dyckman. The reliability of Radi's alleged statement has already been commented on by this Court in Fitzpatrick I (1977), 174 Mont. 174, 569 P.2d 383:

> "Radi had good reason to lie about who shot
> the victim. Without Fitzpatrick present, Radi
> might easily persuade his coconspirators that
> all fatal shots were fired by Fitzpatrick and
> thus avoid some conceived criminal culpability."
> State v. Fitzpatrick (1977), 569 P.2d at 392.

The admissibility of Bushman's testimony concerning Radi's statement while Fitzpatrick was not present, demands a reconsideration. It is important not only with regard to its admissibility at trial but also with regard to the reliability of the verdict where the effect of the conviction has been the imposition of a death sentence. The testimony involved, one accomplice telling another accomplice what yet another accomplice did, is so inherently unreliable that a death penalty should not be imposed where such evidence has been admitted. The Due Process Clause of the Fourteenth Amendment imposes a higher standard of reliability as to the underlying conviction where a death penalty can be imposed, and the evidence admitted here does not meet that standard so as to permit a death sentence.

-32-

PART B: BECAUSE THE RECORD FAILS TO REVEAL WHETHER THE JURY REACHED UNANIMOUS AGREEMENT ON ANY ONE OR MORE OF THE ALTERNATIVE THEORIES OF CRIMINAL RESPONSIBILITY UNDER EACH CHARGE, FITZPATRICK MAY HAVE BEEN DENIED HIS RIGHT TO A UNANIMOUS VERDICT

(1) In General, The Same Kind of Problems Exist Here as Exist in Coleman III:

Fitzpatrick was charged with and convicted of count I, deliberate homicide, count II, aggravated kidnapping, and count III, robbery. The unanimous verdict issue raised here is much like the unanimous verdict issue raised in Coleman III, 38 St.Rep. 1352, in which I wrote a lengthy dissent. Much of what I said on the unanimous verdict issue in Coleman III applies equally here. In addition, the instructions here are, like the instructions in Coleman III, confusing and inconsistent.

The general nature of the unanimous verdict issue can be stated as follows: In each of the charges involved, Fitzpatrick was charged both as a direct principal and as an aider or abettor or an accomplice. In each charge he was accused of committing the crime by several alternative statutory theories. The jury, however, was given only a general unanimity instruction covering all three charges, stating that ". . . all twelve of your number must agree in order to find any verdicts." (Instruction no. 39.) In addition, the verdict forms provided by the trial court to the jury did not require the jury to specify for each charge which of the alternative theories of criminal responsibility it applied in reaching guilty verdicts.

Specifically, the jury's verdict on count I, deliberate homicide, specified only that Fitzpatrick was guilty of "Count I: Deliberate Homicide, as charged in the Information;" the jury's verdict on Count II, Aggravated Kidnapping, specified only that Fitzpatrick was guilty of "Count II:

-33-

Aggravated Kidnapping, as charged in the Information;" and finally, the jury's verdict to Count III, robbery, specified only that Fitzpatrick was guilty of "Count III: Robbery, as charged in the Information."

Fitzpatrick claims there is no assurance that the jury reached unanimous agreement on any one or more of the alternative theories of criminal responsibility which were submitted to the jury for each of the three charges. For each conviction, Fitzpatrick claims there is no basis to determine the theory or theories which the jury used in finding guilt. He further claims that the verdicts do not indicate whether the jury found him guilty of each charge as a direct principal, or as an aider or abettor or an accomplice. Because there is no assurance of jury unanimity on each of the charges, Fitzpatrick claims he has been denied his rights to a unanimous verdict as guaranteed by Art. II, § 26, Montana Constitution, and by the Sixth and Fourteenth Amendments to the United States Constitution. Fitzpatrick relies primarily on United States v. Gipson (5th Cir. 1977), 553 F.2d 453, and on State v. Green (Wash. 1980), 616 P.2d 628, a recent case in which the Washington Supreme Court, in a death penalty case, reversed the defendant's conviction because there was no assurance that the jury had been unanimous in reaching its verdict.

Essentially the same argument was raised recently in Coleman III, but the majority disposed of this argument summarily in part VII of its decision, not even mentioning the issue, let alone discussing it. I dissented to Coleman III and in part II of my dissent, concluded that Coleman had been denied his right to a unanimous jury verdict on both convictions. It is equally clear here that Fitzpatrick may

-34-

have been denied his right to a unanimous jury verdict on each conviction, and I again dissent.

In part II of my dissent in _Coleman III_, I discussed in detail the problems raised and the basic policy for resolving them in favor of the defendant. Those policy reasons apply equally here. I concluded that the State set the ambiguous verdict question in motion by not following the charging procedure set forth in section 46-11-404(1), MCA--that is, the State could have charged Fitzpatrick in separate counts by setting forth one alternative in each count. Second, the trial court contributed to the problem by not instructing the jury that its verdict must be unanimous on each of the alternative theories it might use as a basis to convict. Third, the trial court further compounded the problem by providing ambiguous verdict forms to the jury. These verdict forms do not reveal the underlying alternative theory or theories used as a basis for the guilty verdicts. These procedural problems were not caused by the defendant, they were caused by the State, and the State must bear the consequences.

I cited several cases which hold that a jury must be instructed that its verdict be unanimous on one or more of the alternative theories submitted to it for its decision. State v. Golliday (1979), 78 Wash.2d 121, 137, 470 P.2d 191, 201; People v. Embree (1976), 68 Mich.App. 40, 241 N.W.2d 753; People v. Olsson (1974), 56 Mich.App. 500, 507, 224 N.W.2d 691, 693-694; People v. Thompson (1956), 144 Cal.App. 2d 854, 301 P.2d 313, 316;/State v. Bleazard (1943), 103 Utah 113, 133 P.2d 1000 1002/ And, of course, that is the essence of United States v. Gipson, supra. Each of these decisions state in effect that a general instruction on the unanimity requirement is insufficient.

In addition, although this basic policy should apply in all criminal cases, I stated in Coleman III that the assurance of unanimity is even more essential in a case where a conviction may trigger the imposition of the death penalty. The jury must be more specifically instructed so that the trial court and appellate court know the underlying basis for the jury's conviction. In Beck v. Alabama (1980), 447 U.S. 625, 638, 100 S.Ct. 2382, 2389-2390, 65 L.Ed.2d 392, 403, (cited and quoted also in Coleman III) the United States Supreme Court stated:

> "To insure that the death penalty is . . . imposed on the basis of 'reason rather than caprice or emotion,' [the courts] have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination."

And, in Andres v. United States (1948), 333 U.S. 740, 752, 68 S.Ct. 880, 886, 92 L.Ed. 1055, 1063, (also cited and quoted in Coleman III) the United States Court sent an unequivocal message that in death cases, doubts as to jury unanimity must be resolved "in favor of the accused." Certainly the failure to properly charge, instruct, and provide clear verdict forms to the jury diminishes the reliability of a jury verdict on the unanimity question. And just as certainly, a reasonable doubt is created as to jury unanimity on one or more of the alternative theories charged. For this reason, Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, requires an appellate court to reverse the convictions. See United States v. Gipson, supra, in which the court applied the Chapman test to the unanimity question.

(2) Lack of Jury Unanimity is Only One of The Defects Caused by The Manner of Charging and Instructing the Jury:

-36-

Before commencing an analysis of each charge, and the instructions applicable to each charge, I summarize several common defects which exist in relation to each crime charged.

First, each charge alleges in one count several alternative methods of statutory accountability. This charging procedure violates section 46-11-404(1), MCA, which clearly specifies that alternative statements of the crime should be charged in separate counts. Undoubtedly this charging procedure contributed to the vagueness of the jury verdicts later returned, and set in motion the jury unanimity question. For a discussion of section 46-11-404(1), in relation to charging alternatively, see my dissent in Coleman III, 38 St.Rep. 1381-1382.

Second, the instructions attempting to set forth the essential facts of each charge that must be proved beyond a reasonable doubt are not only inconsistent with each charge, they are also inconsistent with each other. The effect is that the instructions not only constitute an impermissible variance from the charge, the instructions also placed the jury in a position of not knowing which instructions to follow when determining the essential elements of the crimes charged.

Third, nowhere did the trial court instruct the jury that its verdict must be unanimous on any one theory of statutory accountability, and we therefore have no assurance that the jury was unanimous on one or more theories of statutory accountability.

Fourth, the verdict forms provided to the jury add to the confusion because they failed to specify the underlying basis for the verdict, thereby leaving the trial court and the appellate court in the position of not knowing the alternative theory the jury applied in reaching its verdict.

-37-

And fifth, the guilty verdicts for each crime charged are further suspect because substantial evidence does not support each of the alternative theories of accountability alleged for each of the crimes charged.

(3) The Majority Opinion Fails to Reach The True, Underlying Issues:

Before discussing the cases cited by the majority in support of its analysis, and the cases distinguished by the majority in holding against Fitzpatrick on the unanimity issue, it is necessary to place the issue in a broader perspective than what has been discussed and decided in the majority opinion.

The majority opinion implies that Fitzpatrick raised the unanimity argument only in relation to the aggravated kidnapping conviction, count II. That is not the case. In paragraph 8(e) of the petition for post-conviction relief filed in the trial court, Fitzpatrick challenges all three convictions on this ground. And, in his briefs, on appeal, Fitzpatrick raises the unanimity argument on all three convictions.

Another glaring oversight in the majority opinion must be mentioned. The opinion implies that Fitzpatrick claims only a violation of the Montana Constitution (38 St.Rep. at 1458), but he has also claimed that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated. In part II of my dissent in Coleman III, I considered the State's arguments and the trial court's opinion. (38 St.Rep. at 1378.) The State has made virtually identical arguments here, and the trial court made essentially the same rulings. Therefore, what I said in Coleman III applies equally here.

-38-

(4) The Majority Opinion Ignores the Essence of the Holdings in United States v. Gipson and in State v. Green.

The essence of the majority holding, although not expressly stated, is that regardless of whether alternative theories of criminal responsibility are charged in one count, and regardless of whether the jury receives ambiguous jury verdicts, a general unanimity instruction defeats any challenge to the verdict on the ground that the jury was not in unanimous agreement on any one or more theories of criminal responsibility. This holding is unacceptable in any criminal case, and in a capital case such as this, it is unthinkable.

The majority distinguishes United States v. Gipson, supra, because in Gipson, the trial judge, in response to a jury question, told the jury that it need not unanimously agree on the defendant's specific conduct. The appellate court reasoned that, in essence, the trial judge told the jurors that they could reach a guilty verdict if six of them could believe that conduct A violated the statute, and six of them could believe that conduct B violated the statute. Undoubtedly, the judge's instruction helped lead or at least could have led the jury down the wrong path. But that instruction is not the essence of the Gipson holding.

Rather, the gist of the Gipson holding is that where there are alternative charges, the jury must be instructed that it must be unanimous on the theory it applies in reaching a guilty verdict. The Court held:

> ". . . Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury concensus as to the defendant's course of action is also required." 553 F.2d at 458.

As I stated in Coleman III, "implicit in this ruling [the Gipson ruling] is a requirement that the trial court

-39-

instruct the jury that it must reach unanimity on any theory used as a basis to find guilt." 38 St.Rep. at 1384. And, as I have already noted, several jurisdictions require such an instruction. State v. Bleazard, supra (Utah); People v. Thompson, supra (California); State v. Golliday, supra (Washington); People v. Olsson, supra (Michigan); People v. Embree, supra (Michigan). Without such an instruction, a doubt as to unanimity is raised, and any doubts as to unanimity, especially in a death case, must be resolved "in favor of the accused." Andres v. United States, supra.

The majority likewise misinterprets the basic holding in State v. Green, supra, by stating that in Green, substantial evidence did not support one of the two underlying aggravated offenses, but that in Fitzpatrick, substantial evidence supports each alternative theory. I emphasize two factors. First, the majority opinion omits any discussion of the robbery charge, and of the deliberate homicide charge--a conviction which has led to a death sentence. Second, nowhere does the majority opinion analyze the evidence to support its conclusion that substantial evidence exists to support a finding of guilt on each of the alternative theories of aggravated kidnapping. In fact, as I shall later discuss in detail, in reaching its broad, bald conclusion that substantial evidence supports each of the aggravated kidnapping theories, the majority is manifestly in error.

It is true that the Washington Supreme Court stated in Green that substantial evidence did not support both aggravating crimes which were submitted to the jury. However, in setting forth its holding, the Washington Supreme Court did not rely on an absence of substantial evidence on either of the two aggravating crimes submitted to the jury. Rather, the Court

-40-

emphasized that the instructions and verdict forms failed to instruct the jury it must be unanimous on either or both of the underlying aggravating crimes. The Court stated:

> "In the instant case, the jury instructions and verdict form did not require the jury to unanimously find appellant committed or attempted to commit either first degree kidnapping or rape or both. As instructed, it was possible for the jury to have convicted Green with six jurors resting their belief of guilt upon kidnapping and the other six resting their belief upon rape. Thus, it is impossible to know whether the jury unanimously decided that the element of rape had been established beyond a reasonable doubt." 616 P.2d at 638.

The basis for reversal was undoubtedly the ambiguous jury instructions and ambiguous verdict returned by the jury. If the jury had been instructed that it must unanimously convict Green of the underlying aggravated crimes, and if the verdict had specifically stated that the jury found Green guilty of the underlying aggravated crime of rape, the conviction would have been upheld.

I stated in Coleman III that many cases discussing the unanimous verdict requirement erroneously rely on the substantial evidence test as the vital factor in determining whether a conviction must be reversed or can still be upheld. This analysis fails to comprehend the nature of the unanimous verdict requirement. That requirement has nothing to do with whether substantial evidence supports all alternative theories of criminal responsibility. In part II of my dissent in Coleman III, in that section entitled, "Why The Convictions Must Be Reversed," I discuss what I believe to be the proper basis for jury unanimity. 38 St.Rep. at 1384. That analysis applies equally to this case, and my discussion there shall constitute my discussion here.

I proceed next to a discussion of the cases on which the majority relies in holding against Fitzpatrick on the unanimous verdict issue.

(5)  State v. Arndt; State v. Souhrada; United States v. Murray; and United States v. Natelli, Have No Application to the Unanimity Issues Raised Here.

In a sweeping conclusion, the majority disposes of both the factual and legal issues raised by the unanimity question:

> "Moreover, a review of the transcript satisfies us, as it did the district judge, that there was substantial evidence to support all of the alternatives set forth in the instructions.  See State v. Arndt (1976), 87 Wash.2d 374, 553 P.2d 1328, 1330.  See also, State v. Souhrada (1949), 122 Mont. 377, 385, 204 P.2d 792, 796.  Therefore we find that the requirement of unanimity, as guaranteed by the Montana Constitution, was satisfied."  38 St.Rep. at 1458.

Neither of these cases support the proposition cited. In addition, as I shall later discuss, the trial transcript fails to support the broad and bald evidentiary conclusion that substantial evidence supports each alternative theory.

To further buttress its position, the majority then cites two inapplicable federal cases for the proposition that a general unanimity instruction suffices where a defendant is charged with two or more alternative theories of criminal responsibility.  The opinion cites United States v. Murray (2d Cir. 1980), 618 F.2d 892, and United States v. Natelli (2d Cir. 1975), 527 F.2d 311.  Neither of these cases reaches the unanimous verdict questions raised here.

The majority also relies on the Washington case of State v. Arndt, supra, but had it properly read and applied the holding in State v. Green, supra, it would have been apparent that Arndt has no application to the situation here.  In Green, the Washington Supreme Court properly distinguished Arndt, holding that Arndt did not involve alternative theories of criminal responsibility, and therefore was inapplicable. 616 P.2d at 638.

The Washington court distinguished Arndt for two reasons. First, in Arndt, all factual bases for conviction were

-42-

supported by substantial evidence, but in Green the under-

lying aggravated kidnapping charge was not supported by

substantial evidence. 606 P.2d at 638. Second, the Court

distinguished Arndt for a more basic reason, stating:

> "We are also precluded from relying on
> Arndt for a more fundamental reason. In
> Arndt, we considered a statute which provided
> that a person could be convicted of grand
> larceny if he or she committed welfare fraud
> by any one of several overlapping and often
> indistinguishable methods. State v. Arndt,
> supra, 87 Wash.2d at 375, 553 P.2d at 1328.
> The methods were 'closely related, connected
> acts which constitute[d] the single offense of
> fraudulently obtaining public assistance . . .'
> Id. at 382, 553 P.2d at 1333. In the instant
> case, however, the alternative ways of committing
> aggravated murder in the first degree are themselves
> separate and distinct criminal offenses. In order
> to convict a defendant of either kidnapping or rape,
> the State must prove every statutory element of that
> crime beyond a reasonable doubt to a unanimous jury.
> Where, as here, the commission of a specific under-
> lying crime is necessary to sustain a conviction for
> a more serious statutory criminal offense, jury
> unanimity as to the underlying crime is imperative."
> 616 P.2d at 638.

Having distinguished Arndt, the Court then determined

that the jury instructions failed to inform the jury that it

must unanimously agree on the underlying aggravating crime,

and that the trial court failed to provide verdict forms to

the jury that specified the basis for the conviction. These

failures compelled a reversal of the conviction because

"..it is impossible to know whether the jury unanimously

decided that the element of rape had been established beyond

a reasonable doubt." Green, supra, 616 P.2d at 638.

Had the majority carefully read State v. Green, it

would have recognized that our own case of State v. Souhrada
122 Mont. 377, 204 P.2d 792,
(1949)/does not apply to this case for essentially the same

reasons that State v. Arndt did not apply in Green. Both

Arndt and Souhrada involve one charge where connected acts

involve a single offense. Alternative theories of criminal

responsibility were not charged in either Arndt or Souhrada.

-43-

Despite these obvious distinctions, the majority implies that Souhrada also involved a situation in which the defendant was charged with one crime but with alternative theories of criminal responsibility. But that was not the case--Souhrada was charged with involuntary manslaughter, and only one theory of criminal responsibility was alleged in the charge.

Souhrada drove his vehicle into the rear of another vehicle on a public highway, killing three passengers in the other vehicle. The prosecutor charged Souhrada with violating section 94-2507(2), R.C.M. 1947. Although section 94-2507(2) defined involuntary manslaughter in two ways, Souhrada was charged under only one of those theories. The statute provided:

> "Involuntary, in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection." (Emphasis added.)

Souhrada was accused of causing the deaths of the three passengers in the other car by driving his car "without due caution or circumspection."

Before trial started, Souhrada obtained a bill of particulars (no longer used in Montana) in which the prosecutor specified that the evidence would show that Souhrada (a) was driving his car while under the influence of alcohol, (b) that Souhrada drove his car in reckless disregard for his life and for the lives of others, and (c) that Souhrada was speeding. At the conclusion of trial, Souhrada requested certain instructions on unanimity, based on this bill of particulars.

Souhrada offered instructions that would require all twelve jurors to agree that (a) he was under the influence

-44-

of alcohol, or (b) that he drove in reckless disregard for his life and the life of others, or (c) that he was speeding, or (d) that the jury unanimously agree on two or all of these allegations. In effect, Souhrada submitted instructions that required the jury to answer special interrogatories. The trial court denied these instructions.

In stating that the instructions were properly refused, this Court held:

> ". . . It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation, and part upon the other. [Citations omitted.]" 122 Mont. at 385, 204 P.2d at 796.

This decision was correct because Souhrada was charged under one statutory theory of criminal responsibility-- driving his car "without due caution or circumspection." It would have been error to require the jury to return verdicts that would in effect be answers to special interrogatories.

But the unanimous verdict question here just as in Coleman III, is wholly unlike the situation existing in Souhrada. Fitzpatrick was charged with three separate crimes, but under each charge, the State alleged two or more alternative theories of criminal responsibility. I doubt very much that the members of this Court who decided Souhrada would have agreed that it controls either the Coleman III or the Fitzpatrick III unanimity issue. The procedural facts of Souhrada differ from the procedural facts of Fitzpatrick, the issue raised in Souhrada differs from the issue raised in Fitzpatrick, and the result in Fitzpatrick should not be controlled by the result in Souhrada.

-45-

To buttress its opinion that a general unanimity instruction is sufficient, the majority quotes from United States v. Murray, supra, 618 F.2d at 898, and Murray in turn quotes from United States v. Natelli, supra, 527 F.2d at 325. But neither Murray nor Natelli involve situations in which a defendant was charged with alternative statutory theories of criminal responsibility. Nor, of course, did Murray and Natelli involve capital offenses where assurance of jury unanimity must be even more certain. Andres v. United States, supra.

In Murray, the indictment was duplicitious (charging Murray with two crimes in one count) and the jury convicted him of that count without specifying whether he was guilty of one or both offenses. The trial court had instructed the jury that it must be unanimous on any offense charged. In his appeal, the defendant raised the question of a duplicitious indictment. The decision is more than baffling because the Court, in affirming the conviction, never determined whether there was substantial evidence supporting each offense charged. The Court waffled on this point, stating: ". . . the jury unanimously found that we find no reason to doubt that/ there was a conspiracy to violate at least one of the statutes, and that [the] defendant participated in that conspiracy." (Emphasis added.) 618 F.2d at 898. Inexplicably, the Court left unanswered whether the jury may have based its entire verdict on the other alleged statutory violation. If so, the jury may have convicted the defendant of a statutory violation not supported by substantial evidence.

In the absence of any statement by the Court in Murray that substantial evidence supported both charged statutory violations, I fail to see that Murray lends any weight to

-46-

the majority position here. Further, my position stated in part II of my dissent in Coleman III also applies here. The question is not whether substantial evidence supports each alternative statutory theory of criminal responsibility, or all statutory violations charged. Rather, the question is whether the jury reached unanimous agreement on any decision it made. In Murray, the general unanimity instruction was sufficient because defendant was charged with a conspiracy to violate two separate statutes. However, the jury may have unanimously convicted him of a conspiracy based on a statutory violation not supported by substantial evidence. But the court in Murray did not discuss that problem.

Even though the court in Murray inexplicably affirmed the conviction, it was nonetheless critical of the manner in which the criminal charges were filed. The court noted, among other things, that a guilty verdict in this situation fails to disclose the underlying statute which the jury determined the defendant had violated. This disclosure, furthermore, is critically important at sentencing because the judge does not know if the jury convicted the defendant of one or several statutory violations. Further, where the verdict fails to specify the basis of the conviction, a double jeopardy problem unavoidably lurks in the background. 618 F.2d at 899.

Nor is United States v. Natelli, supra, support for the majority position here. In Natelli, two certified public accountants were each charged with two violations of the Securities Act. It was alleged that they made two material misrepresentations on a prospective given to potential investors, and therefore violated two sections of the act. The trial judge instructed the jury that the defendants could be convicted if they made either of the misrepresentations

-47-

that were charged. The jury found both defendants guilty, but the verdicts returned by the jury failed to specify whether one or both misrepresentations had been proved as to each defendant.

The appellate court affirmed the conviction as to one defendant, but reversed the conviction as to the other. The court affirmed as to one defendant because, even though the verdict was ambiguous, the evidence supported a conclusion that this defendant violated both misrepresentations. As to the other defendant, the appellate court found that the evidence was insufficient as to the defendant's involvement in making one of the misrepresentations. Because the verdict did not disclose the basis for the jury's decision, the appellate court reversed as to the defendant. As I shall later explain, the same situation exists in Fitzpatrick as to each of the verdicts returned by the jury, and the convictions must be reversed because each alternative theory charged in Fitzpatrick is not supported by substantial evidence.

I further emphasize that I believe the conviction would have to be reversed even if substantial evidence did support each of the theories of criminal responsibility submitted to the jury. Even assuming that substantial evidence existed on each theory, there still is no assurance that the jury unanimously agreed on any one theory. For further discussion of my reasons, see Coleman III, 38 St.Rep. 1382-1386.

Having discussed the inapplicable authority offered by the majority to support its opinion on the unanimous verdict issue, I next proceed to a detailed analysis of all three charges, and the instructions given, and the verdicts returned on each charge. This task is made more difficult by the majority's failure to engage in any meaningful analysis

of the charges, the instructions, the verdict forms, and the applicable evidence. The majority's perfunctory treatment of this issue should be unacceptable in any criminal case, but must be categorically unacceptable in any death penalty case.

PART C:  THE MANNER OF CHARGING ALTERNATIVELY AND THE INSTRUCTIONS AND VERDICT FORMS GIVEN TO THE JURY FOR EACH CHARGE

(1)  Count I:  Deliberate Homicide-The Charge, The Instructions and the Verdict Form Used:

Montana statutes classify criminal homicide as being either "deliberate homicide, mitigated deliberate homicide, or negligent homicide." Section 45-5-101(2), MCA. The "deliberate homicide" statute does not distinguish between a homicide committed "purposely or knowingly" (a version of the former statutory concept of premeditated murder) and a homicide committed under the felony-murder rule. Each is considered to be "deliberate homicide." Section 45-5-102, MCA. Nor does the sentencing part of this statute distinguish between "purposely or knowingly" committing a homicide, and committing a homicide under the felony-murder rule. The same punishment, including a possible death sentence, may be applied to both. Section 45-5-102(2), MCA.

Fitzpatrick was charged with deliberate homicide under both theories of homicide--"purposely or knowingly" and under the felony-murder rule. In addition to this, Fitzpatrick was accused of being a direct principal or being an aider or abettor to this crime. Although the aiding and abetting statutes treats both situations the same insofar as criminal accountability is concerned (section 45-2-302 and section 45-2-303, MCA), the verdict returned by the jury does not reveal whether the jury found Fitzpatrick to be a direct principal or an aider or abettor. Nor does the

-49-

verdict reveal whether the jury found Fitzpatrick guilty of "purposely or knowingly" causing the death of Monte Dyckman, or whether the jury found him guilty under the felony-murder rule.

Additional problems arise if the jury applied the felony-murder rule to find Fitzpatrick guilty. He was charged alternatively with several statutory theories of criminal accountability. But the verdict stating only that the defendant is guilty of "Count I, Deliberate Homicide, as charged in the Information" does not reveal the underlying felony the jury decided he was committing, had committed, or was withdrawing from. And if the jury applied the felony-murder rule, we also do not know whether the jury was unanimous on one or more of the underlying felonies. Because the jury was not instructed that its verdict must be unanimous as to any of the underlying felonies, the question is whether this Court can say with certainty that the jury was unanimous on one or more of the underlying felonies. We cannot make this determination and therefore we must, by applying the rule of Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, grant Fitzpatrick a new trial. United States v. Gipson, supra.

I emphasize again that Fitzpatrick has attacked all three convictions for lack of assurance of a unanimous verdict, but the majority opinion deals only with the aggravated kidnapping conviction, and even then the discussion is perfunctory. Surely these capital cases merit more careful review than what this Court has given them.

I next discuss the charge of deliberate homicide--the wording of the charge as given to the jury, the instructions attempting to set forth the elements of the charge, and the

-50-

jury verdict finding Fitzpatrick guilty of "Deliberate Homicide, as charged in the Information." The judge told the jury that Fitzpatrick was charged as follows:

"COUNT ONE

". . . [the defendant] committed the crime of DELIBERATE HOMICIDE, to-wit: In that [the defendant] did (a) purposely or knowingly cause, or aided, or abetted, or agreed to aid or abet, or attempted to aid or abet in purposely or knowingly causing the death of Monte Dyckman, . . .; or (b) caused, or aided or abetted, or agreed to aid or abet, or attempted to aid or abet in causing the death of Monte Dyckman while an accomplice to or while engaged in the commission of or attempted commission of Robbery, a felony, or Aggravated Kidnapping, a felony, involving the use of physical force or violence, or the flight thereafter . . ." (Emphasis added.)

According to this charge, Fitzpatrick was accused under part (a) with "purposely or knowingly" causing the death of Monte Dyckman, or under part (b) with causing Monte Dyckman's death while committing or attempting to commit either robbery or aggravated kidnapping. In addition to these alternative charges, Fitzpatrick is accused of being a principal or an aider or abettor to the homicide.

The instructions attempting to explain this charge inform the jury that it may choose between the two theories of criminal accountability. Instruction no. 23 set forth the "purposely or knowingly" and the felony-murder choice:

"A person commits the offense of deliberate homicide if:

"1) He causes the death of another human being purposely or knowingly; or

"2) The death of another human being is caused while the offender is engaged in or is an accomplice in the commission of or an attempt to commit, or flight after committing or attempting to commit robbery or kidnapping." (Emphasis added.)

In addition to setting forth the basic statutory concepts of criminal accountability, it is apparent that instruction no. 23 conflicts with the wording of the charge.

-51-

The charge accuses Fitzpatrick with committing, attempting to commit, or fleeing from the crime of "aggravated kidnapping." The instruction uses only the word "kidnapping." This is not an insignificant departure, because both are distinct and separate crimes. The crime of kidnapping is provided for in section 45-5-302, MCA. The crime of aggravated kidnapping is provided for in section 45-5-303, MCA. This being a death penalty case, that departure cannot be lightly passed over. The crime of kidnapping was not explained in any instruction.

Instruction no. 24, attempting to inform the jury what must be proved to find Fitzpatrick guilty of deliberate homicide, again sets out the alternative theories of criminal accountability:

> "1)   That the defendant purposely or knowingly performed, or aided or abetted in performing, the acts causing the death of Monte Dyckman; or

> "2)   That the death of Monte Dyckman was caused while the defendant was engaged in or was an accomplice in the commission of, or attempted commission of, or flight after such commission or attempted commission of, robbery or kidnapping.

> "If you find from your consideration of all the evidence that one of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty of deliberate homicide.

> "If, on the other hand, you find from your consideration of all the evidence that neither of these propositions has been proved beyond a reasonable doubt, then you should find the defendant not guilty."   (Emphasis added.)

This instruction told the jury that if either part 1 of this instruction was proved, or part 2 of this instruction was proved, the jury should find Fitzpatrick guilty of

-52-

deliberate homicide. In addition, the instruction repeats

the variance from the charge--the charge alleged "aggravated

kidnapping," but the instruction uses the term "kidnapping."

Significantly, nowhere in the instructions is "kidnapping"

defined.

The trial court fully emphasized the effect of the

felony-murder instruction by instruction no. 38, the second

to the last instruction. The trial court told the jury that

it "must" convict Fitzpatrick of deliberate homicide if the

jury convicted him of either robbery or aggravated kidnapping.

Instruction no. 38 stated:

> "You are instructed that you may find the
> defendant guilty or not guilty of any or all
> of the offenses charged, namely, Robbery,
> Aggravated Kidnapping, or Deliberate Homicide.

> "However, if you find that the defendant
> committed the offense of Robbery, or aided or
> abetted in its commission, and that during the
> commission of that offense or his flight
> thereafter, the death of Monte Dyckman was
> caused, you must also find the defendant
> guilty of deliberate homicide.

> "Likewise, if you find that the defendant
> committed the offense of Aggravated Kidnapping,
> or aided or abetted in its commission, and that
> during the commission of that offense or the
> flight thereafter, the death of Monte Dyckman
> was caused, you must also find the defendant
> guilty of deliberate homicide." (Emphasis added.)

Because of the mandatory language of instruction no.

38, the probability is that the jury found Fitzpatrick guilty

of deliberate homicide by application of the felony murder.

But what underlying felony or felonies did the jury agree

on in finding Fitzpatrick guilty of felony-murder? The

verdict stated only that Fitzpatrick was guilty of "Count I,

Deliberate Homicide, as charged in the Information." Nor

can it be determined whether the jury found Fitzpatrick guilty

as a direct principal or as an aider or abettor or accomplice.

-53-

This factor may not be impertinent under Montana law for purposes of fixing criminal accountability, but it is extremely important in making a decision as to whether the death penalty should be imposed. Finally, although the probability is that the jury convicted Fitzpatrick of felony-murder, there is no assurance that it did so, for the instructions permitted the jury to use the "purposely or knowingly" theory.

Nor was the jury instructed that its verdict must be unanimous on any theory of criminal accountability. If the jury found Fitzpatrick guilty by applying the "purposely or knowingly" theory, or if the jury found Fitzpatrick guilty by applying the felony-murder theory of criminal accountability, it cannot be determined whether the jury's verdict was unanimous on any one theory. For example, six may have voted one way, and six may have voted the other, and yet all twelve may have found him guilty of "deliberate homicide." This is one reason the conviction must be reversed. State v. Green, supra.

In addition, assuming that the jury found Fitzpatrick guilty by applying the felony-murder rule, there is no assurance that all twelve jurors agreed on any one of the alternative theories in which "robbery" was charged, and there is no assurance that all twelve jurors agreed on any one of the alternative theories in which "aggravated kidnapping" was charged. If the aggravated kidnapping conviction cannot stand, and if the robbery conviction cannot stand, then the deliberate homicide conviction also must fall. Assurance of jury unanimity is required for each conviction. Furthermore, aside from the jury unanimity issue, the evidence does not support each of the underlying theories of robbery or

each of the underlying theories of aggravated kidnapping, and for this reason also, the deliberate homicide conviction must fall. I will discuss the sufficiency of the evidence later in my dissent.

I next discuss the aggravated kidnapping charge.

Count II: Aggravated Kidnapping--The Charge, The Instructions, and the Verdict Form Used:

In an attempt to keep the death penalty constitutional, Montana's criminal codes have undergone steady change in response to the death penalty decisions of the United States Supreme Court. One of those changes is that the legislature has created crimes which call for the possible imposition of the death penalty if certain statutory aggravating elements are present. This situation exists in relation to the legislature's distinction between kidnapping (section 45-5-302, MCA), and the newly-created crime of aggravated kidnapping (section 45-5-303, MCA), under which the death penalty may be imposed.

Section 45-5-302(1), MCA, states that the crime of kidnapping is committed if a person "knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force." The penalty for kidnapping is imprisonment "for a term of not less than 2 years or more than 10 years, except as provided in 46-18-222." Section 45-5-302(2), MCA. As I noted before, Fitzpatrick was charged in the deliberate homicide count with kidnapping as one of the two alternative theories under the felony-murder alternative. The deliberate homicide charge, however, did not mention the crime of aggravated kidnapping.

The crime of aggravated kidnapping, increases the possible minimum and maximum sentence, and adds an element not included in the crime of kidnapping. Section 45-5-303, MCA, provides that a person is guilty of aggravated kidnapping if he commits a kidnapping with one or more of five specific purposes enumerated in the statute. Because a specific purpose is an essential element of the crime it follows that aggravated kidnapping is not proved if a specific purpose charged is not proved. The specific purposes which constitute aggravated circumstances are important also because of the added penalty. A conviction of aggravated kidnapping carries a minimum of two years and a maximum of 100 years in prison if the victim is harmed while under the control of the defendant. If the victim is released unharmed the penalty is the same as that for the crime of kidnapping. On the other hand, if the victim is not released alive, the death penalty is one of the options. Section 45-5-303(2), MCA.

The aggravating factors which can raise the crime from that of kidnapping to that of aggravated kidnapping, are as follows:

a.  to hold for ransom or reward or as a shield or hostage;

b.  to facilitate commission of any felony or flight thereafter;

c.  to inflict bodily injury on or to terrorize the victim or another;

d.  to interfere with the performance of any governmental or political function; or

e.  to hold another in a condition of involuntary servitude. (Section 45-5-303(1)(a) through (e)). (Emphasis added.)

The State charged Fitzpatrick with aggravated kidnapping under subsections b and c of this statute. Specifically, under subsection b, the State charged that when Fitzpatrick

kidnapped Monte Dyckman, he had the specific purpose to commit an unspecified felony. Under subsection c, the State charged that when Fitzpatrick kidnapped Monte Dyckman, he had the specific purpose to inflict bodily injury on Monte Dyckman or to terrorize Monte Dyckman. Aside from the unanimous verdict issue, as I shall later discuss, there is no substantial issue to support a verdict that Fitzpatrick had the specific purpose in kidnapping, to inflict bodily injury on or to terrorize Monte Dyckman.

Because the jury was instructed that it could find Fitzpatrick guilty of aggravated kidnapping if it found that he had the specific purpose to inflict bodily injury on or to terrorize Monte Dyckman, we cannot assume that the jury did not follow this instruction, and we cannot assume that the jury did not apply this instruction to find Fitzpatrick guilty of aggravated kidnapping. Logically, then, if there is no substantial evidence to support this theory of accountability, and there is not, the jury may have convicted Fitzpatrick based on a theory not supported by substantial evidence. This very real possibility means that not only must the aggravated kidnapping conviction be reversed, but also that the deliberate homicide conviction must be reversed.

I have already discussed the fact that in finding Fitzpatrick guilty of deliberate homicide, because of the mandatory language of instruction no. 38, the jury probably applied the felony-murder rule. Because of instruction no. 38, the jury may well have used the aggravated kidnapping felony as the underlying basis to apply the felony-murder rule. If so, as I mentioned before, the aggravated kidnapping conviction must fall because substantial evidence does not support the theory of accountability that Fitzpatrick had the specific purpose to inflict bodily injury on or to

-57-

terrorize Monte Dyckman. Furthermore, if the jury applied the aggravated kidnapping felony rule in finding Fitzpatrick guilty under the felony-murder rule, the deliberate homicide conviction must fall for the same reason that the aggravated kidnapping conviction must fall--a lack of substantial evidence on one of the theories of accountability.

Any appellate court, in properly applying rules of appellate review to this situation, should recognize that both convictions must be reversed. The rule is a simple one: because there is no basis in the record to determine how the jury reached its verdict, whether it based both verdicts on theories of accountability supported by substantial evidence, or whether it based both verdicts on theories of accountability not supported by substantial evidence, the fact that the jury may have relied on theories not supported by substantial evidence compels a reversal. Furthermore, the fact that the death penalty may then have been imposed based on underlying convictions not supported by substantial evidence, should impel even the most calloused appellate court to reverse the convictions.

I next discuss the charge of aggravated kidnapping, as given to the jury in an instruction, the instructions attempting to define the elements of the crime, and the verdict form given to the jury and which the jury signed in returning its verdict. I discuss the substantial evidence question in a separate section covering all three charges.

Fitzpatrick was charged, and the trial court instructed the jury that Fitzpatrick was charged as follows:

". . . [the defendant] . . . did,. . . commit the
crime of AGGRAVATED KIDNAPPING, to-wit:   In
that [the defendant] did purposely or
knowingly and without lawful authority, restrain,
or aided, or abetted, or agreed to aid or abet,
or attempted to aid or abet in restraining, Monte
Dyckman, by using or threatening to use, or aiding
or abetting or agreeing to aid or abet, or
attempting to aid or abet in using or threatening
to use physical force with the purpose of (a)
facilitating the commission of a felony or flight
thereafter; or (b) causing bodily injury to Monte
Dyckman or terrorizing said Monte Dyckman,. . ."
(Emphasis added.)

According to this charge, the State was required to
prove beyond a reasonable doubt that Fitzpatrick, in kidnapping
Monte Dyckman, had the specific purpose (a) of committing a
felony (an unspecified felony) or (b) that he had the specific
purpose of causing bodily injury to or of terrorizing Monte
Dyckman.  The State was required to prove not only a kidnapping,
but that Fitzpatrick had one or both specific purposes in
mind when he accomplished the kidnapping.

In addition to the alternative charges, Fitzpatrick was
charged both as a direct principal and as aiding or abetting
or being an accomplice.

The jury verdict stated only that Fitzpatrick was
guilty of "Count II:  Aggravated Kidnapping, as charged in
the Information."  This verdict fails to reveal the theory
of accountability used as a basis to reach a guilty verdict.
Did the jury find that in committing a kidnapping (never
defined for the jury) Fitzpatrick had purpose (a) in mind,
or that he had purpose (b) in mind, or that he had both
purposes in mind?  Nor was the jury ever instructed that its
verdict must be unanimous as to (a) or  unanimous as to (b),
and unanimous as to both (a) and (b).  For all we know, six
jurors may have reached their decision by application of
theory (a) and six jurors may have reached their decision by
application of theory (b), thereby depriving Fitzpatrick of
a unanimous verdict.  State v. Green, supra.

-59-

Nor can we tell from the verdict whether the jury found Fitzpatrick guilty as being a direct principal, or whether the jury found him guilty as being an aider or abettor, or an accomplice. This fact may not be important under Montana law to determine accountability for a crime (sections 45-3-302 and 45-2-303, MCA), but it is certainly important for purposes of determining the sentence.

The jury instructions attempting to set forth the elements of aggravated kidnapping served only to add to the confusion. Rather than confine the jury's options to the specific purposes in the charge itself, the instructions expand the options beyond those contained in the charge. And the instructions are inconsistent.

Instructions no. 25 and 26 attempted to set out the essential elements to be proved. The purpose of the instructions was apparently to set forth the definition of aggravated kidnapping as it applied to the actual charge. Instruction no. 25 stated:

> "A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either using or threatening to use physical force with any of the following purposes:
>
> "(1) To facilitate commission of _any_ _felony_ of the flight thereafter; or
>
> "(2) To inflict bodily injury on or to terrorize the victim." (Emphasis added.)

This instruction, as well as the charge itself, allowed the jury to decide if Fitzpatrick had the purpose, in kidnapping Monte Dyckman, to commit _any_ _felony_. An open-ended charge and jury instruction is impermissible. In dissent in State v. Sunday (1980), ___ Mont. ___, 609 P.2d at 1201, 37 St.Rep. 561, at 572D, I registered my objections

-60-

to such open-ended charges and instructions.  The obvious

reason for the statute containing the language "any felony,"

is to permit the prosecution to select the particular felony

which it believes appropriate to the facts of the case.  An

open-ended charge such as that filed here should/ be permitted

not

in any criminal case, but its use is especially objectionable

where a conviction may lead to the imposition of the death

penalty.

The next instruction (instruction no. 26), in setting

forth the elements of the offense and the alternatives to

the jury, further adds to the confusion.  Instruction no. 26

states:

> "To sustain the charge of aggravated kidnapping,
> the State must prove the following propositions:
>
> "First:  That the defendant knowingly or purposely
> restrained or aided or abetted in restraining
> Monte Dyckman by using or threatening to use or
> aiding or abetting in using or threatening to
> use physical force; and
>
> "Second:  That the defendant had the purpose in
> so acting to facilitate, or to aid or abet in
> facilitating, the commission of the crime of
> robbery, or the flight thereafter, or to inflict
> or to aid or abet in inflicting bodily injury
> upon Monte Dyckman or terrorizing Monte Dyckman,
> and
>
> "Third:  That in do [sic] doing the defendant
> acted without lawful authority.
>
> "If you find from your consideration of all the
> evidence that each of these propositions, has
> been proved beyond a reasonable doubt, then
> you should find the defendant guilty.
>
> "If, on the other hand, you find from your
> consideration of all the evidence that any of
> these propositions has not been proved beyond
> a reasonable doubt, then you should find the
> defendant not guilty."  (Emphasis added.)

This instruction permitted the jury to find Fitzpatrick

guilty of aggravated kidnapping if he knowingly or purposely

restrained Monte Dyckman for the <u>specific purpose</u> of robbing

Monte Dyckman or for the <u>specific purpose</u> of inflicting

bodily injury on or of terrorizing Monte Dyckman. Assuming that the jury followed this instruction rather than instruction no. 25 (for they are inconsistent), the question arises as to whether the jury decided that Fitzpatrick had the specific purpose of robbing Monte Dyckman or the specific purpose of inflicting bodily injury on or of terrorizing Monte Dyckman. The answer is not revealed in the record.

Although a specific purpose to commit robbery is supported by substantial evidence--if the testimony of accomplice Joseph Bushman can be accepted, the robbery conviction itself has several defects because of procedural irregularities and the failure of all alternative theories under the robbery charge to be supported by substantial evidence. I shall discuss these defects later. On the other hand, as I shall also later discuss, the specific purpose to inflict bodily injury or to terrorize Monte Dyckman is not supported by substantial evidence. Because the jury verdict does not reveal which theory the jury applied in finding Fitzpatrick guilty of aggravated kidnapping, the conviction must be reversed because of the possibility that that the jury may have reached its verdict by applying an aggravating factor unsupported by substantial evidence.

Reversal is also required because the jury was not instructed that its verdict must be unanimous on one or more of the aggravating theories of accountability which elevate the crime from that of kidnapping to that of aggravated kidnapping. Six jurors could have applied one theory of accountability in reaching their conclusion that Fitzpatrick was guilty, and the other six jurors could have applied another theory of accountability in reaching their conclusion that Fitzpatrick was guilty, and yet all could have agreed that Fitzpatrick was guilty of aggravated kidnapping.

This possibility exists independent of the question whether substantial evidence supports each of the theories of accountability submitted to the jury. If such is the case, and the record does not tell an appellate court otherwise, Fitzpatrick was deprived of a unanimous jury verdict. Add to this situation the fact that the death penalty has been imposed for the crime of aggravated kidnapping, and reversal is not only indicated by application of fundamental rules of appellate review, reversal is mandated. Andres v. United States, supra; State v. Green, supra.

I next discuss the robbery conviction--Count III. This charge must not only be analyzed in its own context, but also in the context of its effect on the charge and conviction of deliberate homicide, and the charge and conviction of aggravated kidnapping. All of these issues are intertwined because of the specific language of the charges and the specific language of the instructions. The validity of each conviction depends upon the validity of the other convictions, a classic example of the dominoes theory as applied to alternative criminal charges.

(3) Count III-Robbery-The Charge, the Jury Instructions, and the Verdict Form Used.

I emphasize again that the majority has omitted discussion of the robbery conviction on the issue of the unanimous verdict requirement and the sufficiency of the evidence question, even though Fitzpatrick raised the issue both in trial court and before this Court.

I first summarize why the robbery conviction must be reversed. First, substantial evidence does not exist on each of the aggravating factors charged in the information, and because an appellate court cannot determine which

aggravating factor the jury applied in reaching its verdict, the conviction must be reversed. Second, the instructions attempting to set forth and define the essential facts for the crime of robbery, are inconsistent with the charge and inconsistent with each other. Third, the instructions expand the scope of the charge to include a possible verdict based on a violation of section 45-5-401(c), MCA, an aggravating factor not charged in the information. Fourth, the jury was not instructed that its verdict must be unanimous on any one aggravating factor (essential fact) required to elevate the crime from that of theft to that of robbery, and therefore Fitzpatrick was deprived of the assurance of a unanimous jury verdict.

Any one of these four defects is sufficient to reverse the robbery conviction and grant a new trial, and any appellate court having a sense of its function should have no hesitation in reversing the conviction and granting a new trial. Add to this the fact that the robbery conviction may have been the underlying basis for the jury's guilty verdict on the charge of deliberate homicide, a verdict which led to the imposition of the death penalty, and even the most insensitive appellate court would recognize that the conviction cannot stand.

The Montana robbery statute sets forth several aggravating factors by which the crime of theft is elevated to the crime of robbery. Section 45-5-401, MCA provides:

"(1) A person commits the offense of robbery if in the course of committing a theft he:

"(a) inflicts bodily injury upon another;

"(b) threatens to inflict bodily injury upon any person or purposely or knowingly puts any person in fear of immediate bodily injury; or

"(c) commits or threatens to commit any felony other than theft."

-64-

This statute further provides that a robbery conviction will result in a prison term of "not less than 2 years nor more than 40 years, except as provided in 46-18-22 [not here pertinent]."

The State charged Fitzpatrick with robbery under this statute, and alleged that he violated sections 45-1-401(1) (a) and (b). Count III charged, and the jury was instructed (instruction no. 2) that Fitzpatrick was charged in the following language:

"COUNT THREE

". . . [the defendant] did,. . . commit the crime of ROBBERY, to-wit: In that [the defendant] (a) did, while in the course of committing, or aiding, or abetting, or agreeing to aid or abet, or attempting to aid or abet in committing a theft . . . inflicted, or aided, or abetted, or agreed to aid or abet, or attempted to aid or abet in inflicting bodily injury upon Monte Dyckman, or (b) did, while in the course of committing, or aiding, or abetting, or agreeing to aid or abet, or attempting to aid or abet in committing, a theft . . . threatened to inflict bodily injury upon Monte Dyckman or purposely or knowingly put Monte Dyckman in fear of immediate bodily injury, or aided, or abetted, or agreed to aid or abet, or attempted to aid or abet in threatening to inflict bodily injury upon Monte Dyckman, or purposely or knowingly put Monte Dyckman in fear of immediate bodily injury . . ." (Emphasis added.)

Fitzpatrick was accused of committing robbery based on two of the statute's three aggravating factors. First, he was accused of inflicting bodily injuries on Monte Dyckman in the course of committing a theft, a violation of subsection (a). Second, he was accused of threatening to inflict bodily harm or putting Monte Dyckman in fear of immediate bodily injury, a violation of subsection (b) of the statute. To convict Fitzpatrick of robbery, the State was required to prove at least one of these two aggravating factors. I emphasize here that this charge did not accuse Fitzpatrick of committing the aggravating factor listed in subsection (c) of the statute. As it turns out, however, the instructions to the jury also gave the jury the option

-65-

of determining whether Fitzpatrick violated subsection (c). The addition of a third aggravating factor, not contained in the charge, is an impermissible variance, and the robbery conviction should be reversed for this reason alone.

As applied to the robbery charge filed, the instruction set forth the essential elements of the crime:

> "A person commits the offense of robbery if, in the course of committing a theft, he:
>
> "1) Inflicts or aids in inflicting bodily injury upon another; or
>
> "2) Commits or aids or abets in committing any felony, other than theft.
>
> "The phrase 'in the course of committing a theft' as used in this section includes acts which occur in the commission of the theft or in the flight after the commission of the theft." (Emphasis added.)

This instruction is inconsistent with the charge in several ways. First, subsection (2) of the instruction adds an aggravating factor not charged in the information. By stating that the jury could convict if it found that Fitzpatrick while committing a theft, had committed any felony other than theft, the instruction went beyond the aggravating factors or essential elements charged in the information. Application of fundamental rules of criminal procedure requires a holding that this is an impermissible variance. And because the death penalty is the underlying issue, such a variance is unjustified under any theory of appellate review that has fundamental due process as its core.

In addition, the instruction is open-ended because it permits a conviction if the jury found that in the course of committing a theft, Fitzpatrick had committed "any felony, other than theft." Without specification of the underlying felony committed in the course of committing a theft, the

way is left for the jury to speculate on virtually any felony that it believes may have been committed, regardless of the evidence, and regardless of any instructions defining the felonies. So if the jury found Fitzpatrick guilty by application of this aggravating factor, what felony did the jury decide that Fitzpatrick committed? Deliberate homicide? Or aggravated kidnapping? Or a felony not even mentioned in the charges nor defined in the instruction?

The inconsistency between the robbery charge and instruction no. 21 raises the question of which instruction the jury followed in reaching its verdict. Did the jury rely only on the language of the charge, or did the jury instead follow the inconsistent directions of instruction no. 21? Because the instructions are inconsistent, the jury obviously could not have followed both of them.

This inconsistency is compounded even more by instruction no. 22, which adds to the defects already existing:

> "To sustain a charge of robbery, the State must prove that the defendant, during the course of committing or aiding or abetting in committing, a theft, either:
>
> "First: Inflicted, or aided or abetted in inflicting, bodily injury upon Monte Dyckman, or
>
> "Second: Threatened or aided or abetted in threatening to inflict bodily injury upon Monte Dyckman or purposely or knowingly put, or aided or abetted in putting Monte Dyckman in fear of immediate bodily injury, or
>
> "Third: Committed or aided or abetted in committing any felony other than theft.
>
> "In the course of committing a theft as used here includes acts which occur in an attempt to commit or in the commission of theft or in flight after the attempt or commission.
>
> "If you find from your consideration of all the evidence that any of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty of robbery.

-67-

"If, on the other hand, you find from your
consideration of all the evidence that <u>none</u>
of these propositions has been proved be<u>y</u>ond
a reasonable doubt, then you should find the
defendant not guilty." (Emphasis added.)

This instruction is neither consistent with the charge

stated in count III (instruction no. 2), nor with instruction

no. 21. It repeats the defect of instruction no. 21 by

adding an aggravating factor not charged in the information.

Under this instruction the jury was again permitted to

convict Fitzpatrick of robbery if in the process of

committing a theft the jury found that he committed "<u>any</u> <u>felony</u>

<u>other</u> <u>than</u> <u>theft</u>." That is the language of subsection (c)

of section 45-5-401(1), and Fitzpatrick was not charged with

this aggravating factor. Furthermore, this part of the

instruction is <u>open-ended</u> as to the felony which Fitzpatrick

is alleged to have committed.

Because the jury, in reaching its verdict on the

robbery charge, was given the open-ended option of deciding

that Fitzpatrick committed "<u>any</u> <u>other</u> <u>felony</u> other than

theft," an appellate court cannot assume that the jury did

not apply this theory in finding him guilty. If the jury

applied the deliberate homicide felony in finding Fitzpatrick

guilty of robbery, the robbery conviction must fall if the

deliberate homicide conviction must fall. And I have already

set forth in this dissent why the deliberate homicide con-

viction must fall. The same is true of the aggravated

kidnapping charge. If the jury applied the aggravated

kidnapping felony in finding Fitzpatrick guilty of robbery,

the robbery conviction must fall if the aggravated kidnapping

conviction must fall. I have also stated why the aggravated

kidnapping charge must fall.

Beyond this, there is, of course, the chance that the

jury, because of the open-ended language of the instructions-

"any other felony . . ."--simply decided that Fitzpatrick committed some other unspecified and undefined felony, and so found him guilty of robbery. If so, the robbery conviction is defective because there is no way to determine from the record just what felony the jury concluded he committed, nor is there any way of knowing if the jury properly applied the law defining that felony, since that felony was never defined.

The robbery conviction must also be reversed because the jury was not instructed that its verdict must be unanimous on one or more of the essential facts which elevate the crime from that of theft to that of robbery. For example, six jurors could have decided upon one theory of accountability and six jurors could have decided on another theory of accountability, and still all jurors could have agreed that Fitzpatrick was guilty of aggravated kidnapping. Aside from the failure of substantial evidence to support each of the theories of accountability, the fact remains that all twelve jurors may not have applied the same theory of accountability in reaching the guilty verdict. If that is so, Fitzpatrick was deprived of a unanimous jury verdict. A reversal is especially mandated because of the effect that the robbery conviction may have had on the deliberate homicide and aggravated kidnapping convictions, both of which convictions led to the imposition of the death penalty.

I turn now to the question of whether substantial evidence exists to uphold all three convictions--aggravated kidnapping, deliberate homicide, and robbery. Because each charge was given to the jury under several alternative theories of accountability, I discuss each of these theories as it relates to the charges filed.

-69-

PART D--
/NOT ALL THEORIES OF ACCOUNTABILITY FOR EACH CHARGE ARE
SUPPORTED BY SUBSTANTIAL EVIDENCE

In virtually the same breath as the majority cited
inapplicable cases for the proposition that a jury need not
be instructed that its verdict must be unanimous on any
theory of accountability applied in reaching a guilty verdict,
the majority declared, without analysis of the evidence,
that substantial evidence supports each of the alternative
theories of accountability submitted to the jury on the
charge of aggravated kidnapping. I again emphasize that
the majority opinion covers only the charge of aggravated
kidnapping, although Fitzpatrick has raised the unanimous
jury verdict issue on all three convictions.

In relying in part on the review of the record under-
taken by the trial court, the majority notes that the trial
court found substantial evidence to support each of the
alternative theories of accountability submitted to the jury.
But the trial court's analysis is as inadequate as the
majority's analysis, for it too entered only a bald all-
encompassing conclusion. After accepting the State's analysis
of why the cases cited by Fitzpatrick were inapplicable
(essentially on the same basis discussed in the majority
opinion), the trial court, in the last paragraph of its
opinion on the unanimous verdict issue, made the following
all-encompassing conclusion:

> "In petitioner's case, substantial evidence exists
> to support each alternative which was contained in
> the jury instructions. The petitioner, was, there-
> fore, not denied the right to a unanimous jury
> verdict."

That is the totality of the trial court's analysis of
the evidence. This conclusion provides no basis to determine
whether the trial court analyzed, in light of the trial

-70-

evidence, each alternative theory submitted to the jury for each charge. This decision, together with the majority opinion, falls far short of the standard of mandatory review that the United States Supreme Court has directed must be undertaken in all death penalty cases. Mandatory review is a sham if all-inclusive conclusions can be substituted for the painstaking review and analysis required in all death penalty cases.

THE SUBSTANTIAL EVIDENCE QUESTION

The majority opinion boldly states that the evidentiary record has been reviewed and that substantial evidence exists on each of the alternative theories submitted to the jury. I take issue with both these assertions.

When this case was appealed from the District Court for the third time, the District Court clerk did not send the trial transcript to this Court, and this Court does not have a transcript of the second trial on file from the previous Fitzpatrick II appeal. An evidentiary record is on file in the archives of the Historical Society, but as far as I know, no one from this Court has gone to the Society to review the record or to check it out for purposes of review.

On the other hand, although I did not personally review the record, I did delegate a law clerk to review the evidentiary record at the Historical Society, and he spent many, many hours there doing just that. It is on a basis of his review and my discussion with him concerning the evidence in the record, that I am able to declare that substantial evidence does not exist on each of the theories of accountability submitted to the jury in relation to all three charges, not just the aggravated kidnapping charge which

is the only charge the majority claims to have reviewed.
This is yet another reason all three convictions must be
reversed and a new trial ordered, and I next set forth
my views of the evidence relating to each charge.

AGGRAVATED KIDNAPPING--SUBSTANTIAL EVIDENCE DOES NOT SUPPORT
EACH OF THE THEORIES OF ACCOUNTABILITY SUBMITTED TO THE
JURY

Because the majority opinion is confined to the
aggravated kidnapping conviction, I first discuss the
evidence in relation to this charge.  One of the aggravating
theories of accountability charged in the information, was
that Fitzpatrick, in kidnapping Monte Dyckman, had the
specific purpose to cause bodily injury to or to terrorize
Monte Dyckman.  The evidence does not support a conclusion
that Fitzpatrick had either purpose in mind when the robbery
was planned or when Dyckman was taken from the bank at
Hardin just before he made the deposit of Safeway Store
receipts.  An appellate court cannot determine from the
record whether the jury applied the   theory of accountability
or some other theory of accountability, and for this reason,
based on well-recognized principles of appellate review,
a reversal is mandated because of the possibility that the
jury applied a theory not supported by substantial evidence.

The principal evidence relied on by the State, the
testimony of accomplice Joseph Bushman, who had been granted
complete immunity in exchange for his testimony, revealed
that neither a homicide nor even bodily harm was contemplated
as part of the robbery plan.  Furthermore, Bushman testified
that  although he was not present when Dyckman was killed,
accomplice Radi had later made the  statement  that
Fitzpatrick shot and killed Dyckman, and that all of the
accomplices present expressed surprise on hearing what

-72-

happened. Nor did accomplice Bushman testify that the participants in the robbery plan had the specified purpose to cause bodily harm to or terrorize the intended victim of the robbery.

And Bushman's uncontradicted testimony that the robbery planners and participants expressed complete surprise at what happened indicates that none of them had the specific purpose to inflict bodily harm or to terrorize the intended victim of the robbery. They were interested only in obtaining money from the person who was in charge of carrying the Safeway receipts to the bank. Nor is there circumstantial evidence from which it can be inferred that Fitzpatrick had the specific purpose in mind to inflict bodily harm or terrorize the intended robbery victim. In fact, the trial court, at the conclusion of the sentencing hearing, expressly found that Fitzpatrick's decision to kill Monte Dyckman was not planned, but rather that it was an instanteous, on-the-spot decision. (See my dissent in Fitzpatrick II/ (1980), ___ Mont. ___, 606 P.2d at 1379, where I discuss this finding in relation to an issue bearing on a death penalty issue.)

A reviewing court properly fulfilling its function, must recognize the possibility that the jury applied this theory of accountability in finding Fitzpatrick guilty of aggravated kidnapping. That is so because there is no way of telling from the record that the jury did not apply this theory of accountability. The possibility of a verdict based on a theory not supported by substantial evidence, compels a reversal. The fact that a death penalty has been imposed as a result of this conviction is still a more compelling reason for reversal. Andres v. United States, supra.

-73-

Nor can an appellate court ignore the fact that the jury was given an open-ended instruction which permitted it to find Fitzpatrick guilty if it found that in accomplishing a kidnapping, Fitzpatrick had the specific purpose to commit "any felony." The jury may have relied on a felony neither specified in the charge nor defined in the instructions, and therefore appellate review to determine the existence of substantial evidence on the theory of accountability, is impossible. The possibility of jury reliance on this theory of accountability is still another reason for reversal.

DELIBERATE HOMICIDE--SUBSTANTIAL EVIDENCE DOES NOT SUPPORT EACH OF THE THEORIES OF ACCOUNTABILITY SUBMITTED TO THE JURY

As previously stated, the deliberate homicide charge was submitted to the jury under two basic theories: that Fitzpatrick had "purposely or knowingly" killed Monte Dyckman, or that Fitzpatrick had killed Monte Dyckman while committing another felony (the felony-murder rule). As I have also explained, the probability is that because of the mandate of instruction no. 38, the jury convicted Fitzpatrick by application of the felony-murder rule. However, not all theories of accountability submitted to the jury under the felony-murder rule are supported by substantial evidence. The possibility therefore exists that the jury found Fitzpatrick guilty by application of an underlying felony that was not supported by substantial evidence. This possibility is yet another reason for reversal of the deliberate homicide conviction.

First, under the felony-murder rule, the jury may have relied on aggravated kidnapping as the underlying felony involved. If so, the deliberate homicide conviction cannot stand for the same reasons that I have concluded the

-74-

aggravated kidnapping conviction cannot stand. Second, as I have also explained in discussing the robbery charge, the jury may have relied on <u>robbery</u> as the underlying felony in applying the felony-murder rule to find Fitzpatrick guilty of deliberate homicide. But assuming a jury relied on robbery as the underlying felony, the deliberate homicide conviction can be upheld only if all robbery theories of accountability are supported by substantial evidence. As I explain next, not all robbery theories of accountability are supported by substantial evidence. Therefore a deliberate homicide conviction based on robbery as the underlying felony for application of the felony-murder rule, must be reversed because of the possibility that the jury relied on a robbery theory of accountability not supported by substantial evidence.

DELIBERATE HOMICIDE--LACK OF SUBSTANTIAL EVIDENCE

One theory of accountability under the robbery charge (subsection (a) of section 45-5-401/ (1), MCA), was that in the course of committing a theft, Fitzpatrick <u>inflicted</u> <u>bodily</u> <u>injury</u> on Monte Dyckman. The obvious intent of subsection (1) (a) is to elevate theft to robbery if bodily injuries are inflicted by a defendant in the course of committing a theft. But it is more than a little incongruous to hold that gunshot wounds which result in instantaneous death are nonetheless bodily injuries within the meaning of subsection (a). Further, subsection (c) of section 45-5-401/ (1), MCA, is the appropriate theory of accountability under the facts of this case. This subsection provides that a theft is elevated to robbery if, in the course of committing the theft, the defendant commits "<u>any</u> <u>felony</u> <u>other</u> <u>than</u> <u>theft.</u>" (Emphasis added.) The appropriate charge, therefore, would

have been an allegation that Fitzpatrick, in the course of committing a theft, committed a homicide. Subsection (c) exists precisely to cover a factual situation such as exists in this case.

Fitzpatrick did not, then, within the meaning of subsection (a) of section 45-5-401/ (1), MCA, inflict bodily injuries upon Monte Dyckman. This subsection does not transform a theft into a robbery where application of lethal force results in instantaneous death. Fitzpatrick was not properly charged under subsection (a) and because no substantial evidence exists to support a conviction on this basis, the deliberate homicide conviction must be reversed.

Even assuming, however, that subsection (a) can be constitutionally applied to the facts of this case, two more defects exist with relation to the theories of accountability submitted to the jury under subsections (1) (a) and (c) which would require reversal of the robbery conviction in any event.

Under subsection (b) of section 45-5-401(1), MCA, it was charged that Fitzpatrick, in the course of committing a theft, "threatened to inflict harm" on Monte Dyckman or that he put Monte Dyckman in "fear of immediate bodily injury." The record is barren of any words spoken by Fitzpatrick or any conduct of Fitzpatrick which shows that he threatened to inflict harm on Monte Dyckman. And the record is also barren of any evidence that Monte Dyckman was placed in "fear of immediate bodily injury." No witness testified that Dyckman was in "fear of immediate bodily injury." And no witness testified to any words uttered by Monte Dyckman or to any conduct of Monte Dyckman that would indicate he was in "fear of immediate bodily injury." A

-76-

conclusion can be justified only by an impermissible assumption that anyone who is taken away in a car is in "fear of _immediate_ bodily injury." Substantial evidence to convict by application of subsection (b) of the robbery statute, does not exist. Because an appellate court cannot determine whether the jury applied this theory in finding Fitzpatrick guilty of deliberate homicide under the felony-murder rule, the possibility that the jury did so compels a reversal.

Finally, if the jury applied subsection (c) of section 45-5-401 in deciding upon an underlying felony to apply under the felony-murder rule, several defects exist. As I explained earlier, the chances are that the jury found Fitzpatrick guilty under the felony-murder rule because of the mandatory language of instruction no. 38.

As I also explained earlier in this dissent, Fitzpatrick was not charged with accountability under subsection (c) of the robbery statute, but the jury was nonetheless instructed that it could reach a verdict based on its conclusion that Fitzpatrick, in committing a theft, also committed "_any felony_ _other_ _than_ _theft_." (Instruction no. 22, supra.) This open-ended instruction, neither limiting the felonies involved nor defining the felonies involved, makes it impossible for an appellate court to determine the felony the jury agreed on as constituting the underlying felony to convict of _robbery_. Did the jury decide that Fitzpatrick, in the course of committing a theft, committed some other nonspecified and nondefined felony? If so, there is no practical way an appellate court can review a substantial evidence question, and reversal of the robbery conviction

-77-

is not only required, so is reversal of the deliberate homicide conviction.

Assuming, on the other hand, that the jury, in convicting Fitzpatrick of robbery under subsection (c), relied on aggravated kidnapping as the underlying felony, the robbery conviction can stand only if the evidence was sufficient on each of the theories of aggravated kidnapping submitted to the jury. But that is not the case.

As I explained in discussing the aggravated kidnapping conviction, substantial evidence does not support all theories of accountability submitted to the jury on this charge. In fact, substantial evidence is lacking on two of the three theories submitted to the jury. This has a direct effect on the robbery conviction. The robbery conviction cannot stand because the jury may have relied on subsection (c) of the robbery statute ("any felony other than theft") in that the underlying felony was that of aggravated kidnapping. The possibility exists then, that in finding Fitzpatrick guilty of robbery, the jury relied on one or both of the aggravating theories of accountability for the crime of aggravated kidnapping which were not supported by substantial evidence. The defect in the aggravated kidnapping evidence affects the validity of the robbery conviction, which in turn affects the validity of the deliberate homicide conviction based on application of the felony-murder rule.

It is clear therefore that the deliberate homicide conviction cannot be upheld if the jury reached its verdict by application of the felony-murder rule. The deliberate homicide conviction can only be upheld if the record revealed that the jury convicted Fitzpatrick based on application of the "purposely or knowingly" theory rather than the felony-

-78-

murder rule.  Not only is it impossible to determine that the jury did this, the probability is that the jury, because of the mandatory language of instruction no. 38, applied the felony-murder rule in convicting Fitzpatrick of deliberate homicide.  General and well-recognized rules of appellate procedure require that the deliberate homicide conviction be reversed.

The second robbery theory of accountability charged is the allegation that Fitzpatrick, while in the course of committing a theft, threatened to inflict bodily harm on Monte Dyckman or that Monte Dyckman was placed in fear of immediate bodily injury.  Section 45-5-401(1)(b), MCA.  I have also discussed the evidence on this theory while analyzing the deliberate homicide conviction, and I concluded that substantial evidence does not support this theory of commission.  Again, because the jury may have relied on this theory of accountability in reaching its verdict, the robbery conviction must be reversed.

The third theory of accountability, not charged, but nonetheless submitted to the jury in the instructions, is an allegation that Fitzpatrick, while in the course of committing a theft, committed "any felony other than theft." See section 45-5-401(1)(b), MCA. If the jury applied this theory of accountability in convicting Fitzpatrick of robbery, two substantial evidence problems arise.

Assuming that the jury found the "other felony" to be that of aggravated kidnapping, the robbery conviction is valid only if the underlying conviction of aggravated kidnapping is supported by substantial evidence on all theories of accountability submitted to the jury.  I have already

discussed the aggravated kidnapping charge and concluded that substantial evidence does not support each of the theories submitted to the jury. The robbery conviction must also be reversed because the sufficiency of the evidence under the second theory of accountability depends in turn on the sufficiency of the evidence supporting each of the theories submitted to the jury on the aggravated kidnapping charge. The jury may have relied on a theory not supported by substantial evidence.

Assuming, on the other hand, that the jury found the "other felony" to be that of deliberate homicide, the robbery conviction must still be reversed because the sufficiency of the evidence under this theory depends on the sufficiency of the evidence relating to the theories of accountability alleged in the felony-murder allegation. Because I have concluded that substantial evidence does not support all theories of accountability submitted to the jury under the felony-murder rule, the robbery conviction must fall for the same reason. The jury may have relied on a theory of accountability not supported by substantial evidence.

Still another reason exists to reverse the robbery conviction as well as the aggravated kidnapping conviction. The open-ended instructions given in the case of robbery, permitted the jury to convict Fitzpatrick if it found that in the course of committing a theft, he had committed "any felony other than theft." The open-ended instructions given on the charge of aggravated kidnapping permitted the jury to convict Fitzpatrick if it found that in the course of restraining Monte Dyckman, he had the purpose to facilitate the "commission of any felony." In each situation the "any

felony" option was not limited in the charge nor identified and defined in the instructions. In reviewing for the sufficiency of the evidence, an appellate court is therefore left in a position of not knowing whether the jury relied on a felony not specifically covered in the charges or identified and defined in the instructions. Under these circumstances, review of a substantial evidence question is impossible. For this reason alone, general and well-recognized principles of appellate review require that both the robbery and aggravated kidnapping convictions be reversed.

PART E--
ONLY A JURY SHOULD BE CONSTITUTIONALLY PERMITTED TO DECIDE WHETHER A DEFENDANT CONVICTED OF A CAPITAL CRIME SHOULD LIVE OR DIE

Fitzpatrick claims, as did Coleman in Coleman II and Coleman III, that only a jury should be constitutionally permitted to make that fateful, final decision whether he should live or die. As a subsidiary issue, Fitzpatrick also argues that only a jury should decide those facts necessary to a determination of whether the death penalty should be imposed. I agree.

As I noted in Coleman III, and as the majority has noted here, the United States Supreme Court, in Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, in vacating the death sentence on other grounds, expressly refused to rule whether a jury is required to make the decision of whether a capitally convicted defendant should live or die. The Court stated: "Nor do we address her contention that the Constitution requires that the death penalty be imposed by a jury . . ." 438 U.S. 609, n. 16.

In my dissent to Coleman II (1979), __ Mont. __, 605 P.2d 1022, 1045, 36 St.Rep. 1157A, 1157II, and in my dissent to Coleman III (1981), ___ Mont. ___, ___ P.2d ___, 38 St.Rep.

at 1401, I stated that if a jury is to be considered the conscience of the community, then only the jury should be constitutionally permitted to decide whether a defendant should live or die. What I said in Coleman II and III, applies equally here.

For example, if a jury was to sit in final judgment in this case, the common sense of the jury would prevail and it would have determined that Fitzpatrick was not "lying in wait or ambush" within the meaning of this aggravating factor set forth in section 46-18-303(4), MCA. See part of my dissent here, and my dissent in Fitzpatrick II, 606 P.2d 1382-1383, 37 St.Rep. 221J-221Z, where I conclude that Fitzpatrick's conduct did not come within the scope of this statutory aggravating factor.

Here, both the sentencing court and the majority have expanded the meaning of "lying in wait or ambush" far beyond any reasonable interpretation, which illustrates how elastic these aggravating factors can be when a sentencing court is determined to impose the death penalty, and when an appellate court is determined to approve the death sentence imposed. The interpretation given to that phrase in this case emphasizes the necessity that a jury, rather than a judge, make these underlying factual decisions which allow the imposition of a death sentence.

PART F--
/DENIAL OF MEANINGFUL APPELLATE REVIEW

(1) The Retroactive Application of the Death Penalty Sentencing Statutes to Fitzpatrick Violates the Ex Post Facto Provisions of the Montana and United States Constitution.

In Coleman II, 605 P.2d 1000, the majority held that the death penalty statutes passed after the commission of the crimes could be applied to Coleman. I dissented. 605

-82-

P.2d 1024-1029. The same thing happened to Fitzpatrick in his appeal and the majority ruled that the issue was controlled by Coleman II. Fitzpatrick II, 606 P.2d 1358-1360. I again dissented, 606 P.2d 1368-1369, and concluded that the burdens imposed on Fitzpatrick by application of the new statutes were plainly to his disadvantage, and therefore the statutes could not be retroactively applied.

In his petition for post-conviction relief, Fitzpatrick raised this issue again, and the trial court denied this claim by ruling that Coleman II and Fitzpatrick II were controlling. Fitzpatrick has again raised this issue on appeal. Even though this Court has unequivocally committed itself to applying a United States v. Sanders analysis in determining whether an issue previously raised and decided is res judicata, the plain fact is that the majority has not even mentioned the ex post facto issue in its opinion. If Sanders means anything at all, it means that the majority has a duty to apply the three criteria before determining that it is res judicata. But Sanders has not been applied at all; anyone reading the majority opinion would not know that the issue of retroactive application of the death penalty statutes had again been raised. The majority opinion is not even a pro forma attempt to comply with Sanders, let alone an attempt to engage in a meaningful discussion of the ex post facto issue.

The issue has substantial merit. In discussing the issue of whether section 46-18-305, MCA, unconstitutionally shifts the burden to defendant to prove that any mitigating factors are "sufficiently substantial to call for leniency," the majority, although it denied this claim, admits for the first time that the statute does shift the burden to the

defendant. This burden, then, was imposed on Fitzpatrick when he was sentenced under the death penalty statutes enacted after the crime was committed. By contrast, the death penalty statutes in effect when the crime was committed, provided that for a deliberate homicide conviction, the death penalty would be imposed if there were "no" mitigating factors. Sections 94-5-105 and 94-5-304, R.C.M. 1947. In other words, any mitigating factor was sufficient to defeat the imposition of the death penalty. But this was not so under the new statutes which were applied to Fitzpatrick. This change in the law is "plainly to the disadvantage of [the Petitioner]" and therefore cannot be permitted under either the federal or state constitution. Lindsey v. Washington (1937), 301 U.S. 397, 401-402, 57 S.Ct. 797, 799, 81 L.Ed. 1182, 1186. In addition, under the majority reasoning in McKenzie I, II, and III, the old statutes permitted a review of the sentence in its entirety, but this Court's review under the new statutes, is not nearly as broad.

The fact that the majority has now admitted that section 46-18-305, MCA, shifts the burden to defendant to prove that there are mitigating factors "sufficiently substantial to call for leniency," undermines the majority's conclusion that the ex post facto provisions were not violated. By admitting the burden shifting effect of section 46-18-305, the majority has necessarily invoked consideration of the ex post facto prohibitions of the Montana and United States Constitutions. By failing to apply the Sanders criteria to the ex post facto claim, and by evading the issue altogether, the majority has further undermined its position by failing to give meaningful appellate review to the issues presented by Fitzpatrick.

-84-

(2) In Permitting a Death Sentence for Deliberate Homicide the Trial Court and the Majority have Ignored and Misapplied the Standards of North Carolina v. Pearce.

After his first trial, Fitzpatrick was sentenced to 100 years for his conviction on the crime of deliberate homicide. After this Court's reversal and remand for another trial (Fitzpatrick I) and after again being convicted of deliberate homicide, Fitzpatrick was given the death penalty. Although this Court has no state standards for this situation, North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, permits a more severe sentence after a second conviction only if it is based on objective conduct of the defendant occurring after the first sentence. 395 U.S. at 726, 89 S.Ct. at 2081, 23 L.Ed.2d at 670. The sentencing court acknowledged that in imposing the death penalty, it was violating North Carolina v. Pearce, but it nonetheless did so. 606 P.2d at 1376. The trial court imposed this death sentence even though there was absolutely no objective conduct occurring after the first sentence on which the trial court relied to impose the death sentence. See my dissent in Fitzpatrick II, 606 P.2d 1370-1381, 37 St.Rep. 221G-221V. Furthermore, I doubt that the United States Supreme Court would ever permit the death penalty to be imposed after retrial if it had not been imposed after the original trial.

In paragraph 9(a) of his petition for post-conviction relief, Fitzpatrick again raised this issue and he asked the sentencing court to correct its earlier decision. The sentencing court refused to do so, however, and simply alluded to the fact that the matter had been considered and the Pearce standards applied in Fitzpatrick II.

In this appeal, Fitzpatrick again claims that this Court and the sentencing court have misapplied and therefore violated

-85-

the _Pearce_ standards. (Respondent's Brief at 12-16.) By
failing to discuss or even mention the _Pearce_ issue in its
responsive brief, the State has in effect admitted that these
standards were violated. Fitzpatrick again brought this
fact to our attention in his reply brief, and noted that
the State had not replied to his argument. (Respondent's
Reply Brief, at 6.) But now the majority opinion has also
evaded this issue by failing to mention that it has been
raised. If the three criteria of Sanders v. United States
mean anything, how can the majority fail to discuss Fitzpatrick's
allegation that the sentencing court and this Court (_Fitzpatrick
II_) have emasculated the standards set forth in North Carolina
v. Pearce.

I adhere to my dissent in _Fitzpatrick II_ on this issue.
606 P.2d 1375-1381, 37 St.Rep. 221M-221V, in which I pointed
out that the trial court relied on two impermissible factors
in sentencing Fitzpatrick to death after the second trial.
First, it relied on the testimony of Christine Fetters, who
testified at the second trial about Fitzpatrick's conduct
_before_ the first trial. This, I concluded, was manifestly
in violation of the _Pearce_ standards. 606 P.2d 1378-1381,
37 St.Rep. 221R-221V. Fitzpatrick now cites a case which
holds that _Pearce_ means exactly what it says: only conduct
occurring after the first sentencing can be considered, and
this necessarily _excludes_ consideration of new information
about the crime. United States v. Hawthorne (3rd Cir. 1976),
532 F.2d 318, cert.den. 429 U.S. 894 (1976).

Second, in sentencing Fitzpatrick to death, the trial
court relied (although ever so vaguely) on Fitzpatrick's
demeanor on the witness stand at the second trial. This, I
concluded, was also manifestly in violation of the _Pearce_

-86-

standards.  606 P.2d at 1380, 37 St.Rep. 221T-221U.

Fitzpatrick now cites a case which holds that the demeanor

of the defendant on the witness stand cannot be considered.

United States v. Markus (2d Cir. 1979), 603 F.2d 409.

It is clear, therefore, that the majority has nullified

the Pearce standards in permitting the death penalty for

Fitzpatrick's deliberate homicide conviction.  I add to this

an additional erroneous factor on which the majority relied

in struggling to get out from under the Pearce standards.

The majority stated in Fitzpatrick II that in Pearce the

same trial judge presided over both trials and also imposed

the sentence, but that a new judge presided over Fitzpatrick's

second trial and it was this judge who imposed the death

penalty.  606 P.2d at 1358, 37 St.Rep. at 212.  Based on

this distinction, the majority then stated that the element

of vindictiveness was present in Pearce, but a new judge

presiding over Fitzpatrick's second trial  eliminated this

element of vindictiveness.  In dissent, I stated that not

only is this an impermissible distinction, but that a new

judge had in fact presided over the second trial of Pearce,

and therefore that the attempted distinction cannot stand.

That a different trial judge presided over the second trial

of Pearce cannot be denied.  See, State v. Pearce (1966),

268 N.C. 707, 151 S.E.2d 571.

Beyond question, the trial court has ignored the Pearce

standards and the majority has again permitted it  to ignore

these standards for imposing a more severe sentence after the

second trial.  Failure to discuss the issue raised on appeal

can lead only to the conclusion that the three criteria test

of Sanders v. United States when determining whether an issue
has already been abandoned.
is res judicata, or whether it should be again decided,/ The

-87-

failure to apply this test, together with the obvious violation of the Pearce standards, only underscores the obvious: not only must the death sentence for the deliberate homicide conviction be set aside, the entire death sentence must be set aside.

Where a sentencing court and where the highest appellate court in a state refuse to apply standards mandated by the United States Supreme Court, the legitmacy of the death sentence for deliberate homicide is not only called into question, the legitimacy of the death penalty imposed for the crime of aggravated kidnapping is also called into question. I would vacate both death sentences imposed and order that the death penalty cannot again be considered for either crime.

(3) The Statutory Aggravating Circumstance of "Lying in Wait or Ambush" Has Been Improperly Expanded to Apply to This Case.

In sentencing Fitzpatrick to death for deliberate homicide, the trial court found, by stretching the aggravating circumstance statute beyond the breaking point, that the death occurred while Fitzpatrick was "lying in wait or ambush." (Emphasis added.) This Court concluded in Fitzpatrick II, without analysis, that Fitzpatrick committed the homicide "while lying in wait or ambush." 606 P.2d at 1361, 37 St.Rep. at 216. Although Fitzpatrick did not contest that finding in his second appeal, this Court nonetheless has a mandatory duty of appellate review mandated by the United States Supreme Court and by Montana statute. I dissented to the sentencing court's finding and concluded that the homicide was not committed "while [Fitzpatrick] was lying in wait or ambush," and therefore the death penalty could not be imposed. 606 P.2d 1381-1384, 37 St.Rep. 221V-221Z. I adhere to those views today.

-88-

The sentencing court and the majority here have expanded the meaning of the phrase, "while lying in wait or ambush," to such an extent, that it fails to provide any "inherent restraint on the arbitrary and capricious infliction of the death sentence." Godfrey v. Georgia (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398. Rather, it is an example of how the sentencing courts and appellate courts are giving expansive interpretations of the death penalty statutes in order to liberally impose the death penalty. It precisely illustrates the attitude of the state courts which Justice Marshall condemned in Lockett v. Ohio (1978), 438 U.S. 586, at 621, 98 S.Ct. 2954, at 2973, 57 L.Ed.2d 973, at 1000. Also see, part VIII of my dissent in Coleman III (1981), ___ Mont. ___, ___ P.2d ___, 38 St.Rep. 1403.

In his petition for post-conviction relief, Fitzpatrick raised the issue concerning the application of the statutory aggravating factor necessary to impose the death penalty in this case. Section 46-18-303(4), MCA,/states that one aggravating factor occurs if "[t]he offense was deliberate homicide and was committed by a person lying in wait or ambush." I stated in Fitzpatrick II, and I state again today, that this term means the legislature has increased the sentence for deliberate homicide if the homicide is committed while the defendant was laying in wait and then ambushed the victim intending to kill. I also concluded that the application of this aggravating factor is inapplicable here because the sentencing judge found that the decision of Fitzpatrick to kill was an instantaneous, impulsive action, and that it occurred after Fitzpatrick was laying in wait or ambush in order to commit a robbery. 606 P.2d at 1383, 37 St.Rep. at 221X. It is by no means clear that the legislature intended

-89-

that this aggravating circumstance be applied where the defendant plans a robbery, lays in wait, and then ambushes his victim intending only to rob him. And that is exactly what happened here.

The majority distinguishes Godfrey v. Georgia, supra, because the Georgia death penalty statute was worded more broadly than the Montana statute and did not imply any inherent restraint against the arbitrary and capricious infliction of the death sentence. On the other hand, the majority finds that the term "lying in wait" prescribes a sufficiently specific standard to render the statute constitutional on its face. I agree that the term "lying in wait" limits the imposition of the death penalty to those situations. But the statute is not so clear that it can be interpreted to apply where a homicide occurs after the defendant "lay in wait" for the purpose not of committing a homicide, but for the purpose of committing a robbery. Further, the sentencing court's finding that Fitzpatrick's decision to kill Monte Dyckman came long after he "lay in wait," is convincing evidence that the statutory aggravating circumstance does not apply in this case.

This aggravating circumstance, although perhaps constitutional on its face, was unconstitutionally applied to Fitzpatrick. There is no evidence that Fitzpatrick lay in wait to kill his victim. There is no evidence to establish that Fitzpatrick intended to kill Monte Dyckman as part of the original robbery plan. The trial court found that the intent to kill Monte Dyckman arose well after the act of "lying in wait or ambush." This conclusion establishes that it was impermissible for the trial court to nonetheless rule that the aggravating factor was satisfied.

The decision of the sentencing court and the majority here that Fitzpatrick was "lying in wait or ambush," hardly falls within the permissible discretion set forth in Gregg v. Georgia:

> ". . . where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

Instead, it confirms what Justice Marshall said in Lockett v. Ohio, supra, about the failure of the states to fairly or rationally administer the death penalty laws. Based on my own experience sitting on death penalty cases, I am compelled to echo the words of Justice Marshall.

(4) In Sentencing Fitzpatrick to Death the Trial Court Improperly Relied on a Previous Unconstitutionally Infirm Conviction.

Fitzpatrick claims that the trial court, in considering the existence of any possible mitigating factors, improperly relied on a prior conviction that had been reversed. Burgett v. Texas (1967), 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319, clearly holds that a sentencing court cannot consider a constitutionally infirm conviction procured in violation of the Gideon standards. And we have also held in State v. Olsen (1980), ___ Mont. ___, 614 P.2d 1061, 37 St.Rep. 1313, that infirm convictions should not be considered for sentencing purposes. Nevertheless, the trial court in fact indirectly considered an infirm conviction, and the majority has given its approval. This effectively negates the Burgett and Olsen holdings.

The trial court accomplished indirectly what it could not do directly. Fitzpatrick had been convicted of homicide while in prison on another conviction, but the homicide

-91-

conviction was reversed and dismissed by this Court because, among other things, he was denied counsel. Fitzpatrick v. Crist (1974), 165 Mont. 382, 528 P.2d 1322. Under Burgett and Olsen, supra, Fitzpatrick's conviction could not be considered for any purpose. Here the sentencing court recognized Burgett in one breath, but in the next breath nullified Burgett by holding that Fitzpatrick's reversed homicide conviction is ". . . material in demonstrating that the defendant's conduct in prison is not a source of mitigation with respect to the sentencing issues." In other words, the sentencing court effectively declared it would consider this conviction as casting a shadow over the entirety of Fitzpatrick's conduct while he was in prison. To properly comply with Burgett, the sentencing court should have disregarded the homicide conviction, and then determined whether the remainder of Fitzpatrick's conduct while he was in prison constituted a source of mitigation.

The majority has totally evaded the issue of whether Fitzpatrick's constitutionally infirm homicide conviction was held against him at the sentencing proceeding. The majority stated that:

> "Here the judge declared that he could not and would not rely on the prior conviction. We find this to be sufficient to safeguard petitioner's interest in an appropriate and constitutional sentence." (Emphasis added.)

It is not sufficient that the trial court only declare its nonreliance on a constitutionally infirm conviction, nor is it sufficient for this Court to hold that this declaration is sufficient. The fact is that the sentencing court did rely on the constitutionally infirm conviction by refusing to look at Fitzpatrick's entire conduct record while in prison, aside from the constitutionally infirm conviction.

-92-

The majority has evaded the issue and denied the defendant meaningful appellate review.

(5) This Court Has Failed to Obey a Statutory Directive Requiring Us to Promulgate Rules for Proportional Review of Death Sentences and to Conduct Review According to Those Rules.

Before proceeding to Fitzpatrick's contentions regarding our failure to properly review his sentence, I first must state that this Court has violated section 46-18-308, MCA, which requires us to promulgate rules by which proportional review is conducted. Coleman raised this issue in Coleman II and III, and in Coleman III, in part VIII of my dissent to Coleman III, ___ P.2d ___, 38 St.Rep. at 1405, I agreed that we had failed to promulgate the rules as required by statute. That same situation exists with relation to Fitzpatrick. We still have failed to promulgate rules as mandated by statute. How, then, can we permit imposition of a death sentence? Before any death penalty can be carried out, this Court has a duty to first adopt rules governing proportional review, and then to review the death sentence imposed by application of these rules.

(6) In Conducting Proportional Review This Court Has Not Adhered to the Mandate of the United States Supreme Court.

Fitzpatrick makes essentially the same claim as did Coleman in Coleman III, that we failed to comply with the proportional review mandated by Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Gregg requires that on mandatory review the state's highest appellate court consider "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

I take the same position here as I took in Coleman III, where I stated:

". . . our system of review must allow access to and a consideration of all reasonably recent cases in this state where a defendant has been convicted of either deliberate homicide or aggravated kidnapping.

"Our duty is to review each of these cases and consider the nature of the crime involved and the individual characteristics of the persons who committed the crimes. We must then compare those situations with the crimes committed here and with the personal characteristics of the person involved here. This Court has wholly failed to provide proportional review as mandated by Gregg, and I therefore fail to see how this Court can sanction the imposition of the death penalty." ___ Mont. ___, ___, ___ P.2d ___, ___, 38 St.Rep. 1352, 1405.

I would hold then that Fitzpatrick has not had proportional review as mandated both by statute and by Gregg v. Georgia. This Court must first promulgate the rules by which proportional review is to be governed, and then we must again review Fitzpatrick's death sentence by application of those rules and by adhering to the spirit of Gregg v. Georgia.

PART G--
/THE DEATH PENALTY STATUTE UNCONSTITUTIONALLY SHIFTS THE BURDEN TO DEFENDANT TO SHOW THAT HIS LIFE SHOULD BE SPARED

Fitzpatrick claims, as did Coleman in Coleman III, that section 46-18-305, MCA, unconstitutionally shifts the burden to defendant to show his life should be spared. The statute provides in pertinent part that the sentencing court "shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." The majority now admits that the statute does shift the burden of persuasion, but holds that it is not unconstitutional. ___ Mont. ___, ___ P.2d ___, 38 St.Rep. at 1460.

In Coleman III, the majority evaded this issue by disposing of it and 12 other issues in part V of its omnibus ruling. It was raised as issue OO in Coleman III. In part V

-94-

of my dissent in Coleman III, ___ P.2d ___, 38 St.Rep. at 1399, I concluded not only that the statute does shift the burden to the defendant to convince the sentencing court his life should be spared, but that it is an unconstitutional shifting of the burden of persuasion. What I said there applies equally here.

I noted in my dissent in Coleman III, as the majority notes here, that the United States Supreme Court in Lockett v. Ohio, supra, specifically declined to rule on this issue in vacating the death sentence on other grounds.

I further note that the majority has now placed itself in a bind by belatedly admitting that this statute shifts the burden of persuasion to defendant to prove his life should be spared. The majority has already held that the retroactive application of the new statutes imposed no greater burden on the defendant than before. Coleman II, ____ Mont. ___, 605 P.2d at 1010-1015, 37 St.Rep. at 214. And the majority held the same in Fitzpatrick II, ____Mont. at ___, 606 P.2d at 1358/ 37 St.Rep. at 212-214. The fact is, however, that under the old statutes Coleman and Fitzpatrick did not have this burden. See my dissent in Fitzpatrick II, 606 P.2d at 1368-1369. The majority's declaration that the statute is an indirect admission that section 45-18-305, MCA, flies in the face of the ex post facto provisions of the United States and Montana Constitutions, by imposing a higher burden on the defendant than did the former statutes.

PART H--
AN EVIDENTIARY HEARING IS REQUIRED SO THAT FITZPATRICK CAN PRESENT EVIDENCE THAT DEATH BY HANGING IS CRUEL AND UNUSUAL PUNISHMENT

Fitzpatrick claims, as did Coleman in Coleman III, that death by hanging constitutes cruel or unusual punishment and therefore violates Art. II, § 22, of the Montana Constitution,

-95-

and the Eighth and Fourteenth Amendments to the United States Constitution. In its summary and wholesale disposition of this issue in part VII of Coleman III, the majority denied Coleman's claim. That claim is now denied to Fitzpatrick. In part VII of my dissent in Coleman III, I stated that Coleman raised a substantial claim and that he was entitled to an evidentiary hearing to determine this issue. ____ P.2d at ____, 38 St.Rep. at 1403. My dissent in Coleman III shall also constitute my dissent here.

CONCLUSION

In Fitzpatrick II, I dissented only on the death penalty issues. The unanimous jury verdict issue was not raised then, and neither was the sufficiency of the evidence issue raised as it applies to the alternative theories of accountability submitted to the jury on each charge. On both the unanimous verdict issue and the sufficiency of the evidence issues, all three convictions must be reversed. Furthermore, the instructions are inconsistent with relation to the deliberate homicide charge and aggravated kidnapping charge, and this is another reason those convictions must be reversed. It is inconceivable to me how any appellate court would uphold the convictions where such error has occurred. And the death penalty was imposed for the deliberate homicide and the aggravated kidnapping conviction is a compelling reason why the convictions must be reversed.

Aside from the trial issues, the trial court sentenced Fitzpatrick to death in violation of federal constitutional standards, and in violation of our own statutory sentencing standards. Add to this the failure of this Court in Fitzpatrick II, and now in Fitzpatrick III to provide meaningful review of the death penalty issues raised both at the

trial court and before this Court, and we have a classic case for federal court intervention. Once again I must state that this death penalty case has confirmed my belief that state courts are incapable of rationally and fairly administering death penalty laws.

Daniel J. Shea
Justice

Mr. Justice Frank B. Morrison, Jr., dissenting:

This dissent must begin with the conviction for robbery. If that conviction is defective, and if the robbery conviction was used as a basis for conviction for aggravated kidnapping and deliberate homicide, then the latter two convictions would also have to be set aside.

Justice Shea indicates, and the record supports his assertion, that defendant was charged with robbery under subsections a and b of section 45-5-401(1). Yet as Justice Shea points out the trial court instructed the jury as to subsection c of that statute which allows conviction for robbery if, during the commission of a theft, the defendant commits any other felony. Subsection c was not charged but was given to the jury as an alternative means of finding the defendant guilty of robbery. This was error. Furthermore, an instruction is erroneous that allows the jury to convict a defendant on the basis of finding the defendant committed "a felony" where a felony has not been specified and defined for the jury. In other words, this type of instruction is erroneous because it allows the jury to speculate and prevents the defendant from knowing the charge and preparing a defense.

There is another and more glaring error in the robbery instruction. The Court gave the following instruction:

> "To sustain a charge of robbery, the State
> must prove that the defendant, during the
> course of committing or aiding or abetting
> in committing, a theft, either:
>
> "First:  Inflicted, or aided or abetted in
> inflicting, bodily injury upon Monte Dyckman,
> or
>
> "Second:  Threatened or aided or abetted in
> threatening to inflict bodily injury upon
> Monte Dyckman or purposely or knowingly put,
> or aided or abetted in putting Monte Dyckman
> in fear of immediate bodily injury, or

"Third:  Committed or aided or abetted in committing any felony other than theft.

"In the course of committing a theft as used here includes acts which occur in an attempt to commit or in the commission of theft or in flight after the attempt or commission.

"If you find from your consideration of all the evidence that any of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty of robbery.

"If, on the other hand, you find from your consideration of all the evidence that none of these propositions has been proved beyond a reasonable doubt, then you should find the defendant not guilty."  (Instruction No. 22)

The only other instruction which bears upon the offense of robbery is Instruction No. 1 in which the Court read to the jury the charge against defendant.  The applicable portion of that instruction reads as follows:

"COUNT THREE

"On or about April 5, 1975, Bernard James Fitzpatrick, did, at Hardin, Big Horn County, Montana, commit the crime of ROBBERY, to-wit:  In that Bernard James Fitzpatrick (a) did, while in the course of committing, or aiding, or abetting, or agreeing to aid or abet, or attempting to aid or abet in committing a theft of money and/or checks of the Hardin, Montana Safeway Store, inflicted, or aided, or abetted, or agreed to aid or abet, or attempted to aid or abet in inflicting bodily injury upon Monte Dyckman, or (b) did, while in the course of committing, or aiding, or abetting, or agreeing to aid or abet, or attempting to aid or abet in committing, a theft of money and/or checks of the Hardin, Montana Safeway Store, threatened to inflict bodily injury upon Monte Dyckman or purposely or knowingly put Monte Dyckman in fear of immediate bodily injury, or aided, or abetted, or agreed to aid or abet, or attempted to aid or abet in threatening to inflict bodily injury upon Monte Dyckman, or purposely or knowingly put Monte Dyckman in fear of immediate bodily injury, in violation of Section 94-5-401(1)(a) or (b), R.C.M. 1947."

Nowhere in the instructions is the offense of theft defined.  Theft is defined in 45-6-301, MCA, as follows:

-99-

"45-6-301.  Theft.  (1) A person commits the offense of theft when he purposely or knowingly obtains or exerts unauthorized control over property of the owner and:

"(a) has the purpose of depriving the owner of the property;

"(b) purposely or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

"(c) uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

"(2) A person commits the offense of theft when he purposely or knowingly obtains by threat or deception control over property of the owner and:

"(a) has the purpose of depriving the owner of the property;

"(b) purposely or knowingly uses, conceals, or abandons the property in such a manner as to deprive the owner of the property; or

"(c) uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

"(3) A person commits the offense of theft when he purposely or knowingly obtains control over stolen property knowing the property to have been stolen by another and:

"(a) has the purpose of depriving the owner of the property;

"(b) purposely or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

"(c) uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

"(4) A person commits the offense of theft when he purposely or knowingly obtains or exerts unauthorized control over any part of any public assistance, as defined in 53-3-101, by means of:

"(a) a knowingly false statement, representation, or impersonation; or

"(b) a fraudulent scheme or device.

"(5) A person convicted of the offense of theft of property not exceeding $150 in value shall be fined not to exceed $500 or be imprisoned in the county jail for any term not to exceed 6 months, or both. A person convicted of the offense of theft of property exceeding $150 in value or theft of any commonly domesticated hoofed animal shall be imprisoned in the state prison for any term not to exceed 10 years.

"(6) Amounts involved in thefts committed pursuant to a common scheme or the same transaction, whether from the same person or several persons, may be aggregated in determining the value of the property."

Under the Court's instructions the jury was left to speculate about what the Court meant when using the term theft in the robbery instruction. This omission is obvious error requiring reversal.

Failure to define legal terms was treated by the Oregon Appeals Court in State v. Delucia (1979), 40 Or. App. 711, 596 P.2d 585. In that case the defendant appealed from his conviction of third degree assault. At trial, defendant requested that the following instruction be given:

"A person in lawful possession or control of premises is justified in using physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon the premises." (596 P.2d at 586)

The appellate court held that the rejected instruction was an accurate statement of the law but it was incomplete for failure to define "criminal trespass." The following excerpt is taken from the court's opinion:

"The instruction, as requested, follows exactly the language of ORS 161.225(1) which delineates the use of physical force in defense of premises. It is, therefore, a correct statement of law insofar as it goes. Its defect lies in its incompleteness. ORS 161.225(1), as repeated in the

instruction, allows the use of physical force to prevent or terminate what is reasonably believed to be the commission or attempted commission of a criminal trespass in or upon the premises. Therefore, in order to decide whether the defense was justified, the jury must know what a 'criminal trespass' is so that it may determine whether defendant had a reasonable belief that one was indeed committed or imminent." (596 P.2d at 586) (Emphasis supplied.)

The Montana Supreme Court has spoken on the need to define legal terms when instructing in a criminal case. State v. Larson (1978), _____ Mont. _____, 574 P.2d 266, 35 St. Rep. 69. In that case defendant complained on appeal that the trial court erred in giving extensive definitions of "knowledge" and argued that the extensive nature of the definitions was prejudicial to defendant. In answering this contention of the defendant the court said:

"* * * the crimes charged, mitigated deliberate homicide and aggravated assault, require 'knowledge' or 'purpose' on the part of the accused. The jury therefore was entitled to a complete definition of 'knowledge' and the given instruction, taken almost verbatim from section 94-2-101(27), R.C.M., 1947, was such a definition." (574 P.2d at 270) (Emphasis supplied).

Here, the court did not give any definition of theft. The jury could not have convicted the defendant of robbery without first finding that the defendant committed a theft. Without defining a theft in statutory language the jury would be left to speculate and in all likelihood, would apply a lay definition of theft which might well be contrary to the offense outlined in the Montana statute. There is simply no way that this Court can overlook such obviously prejudicial error. The robbery conviction must fall and with it necessarily the balance of the offenses charged must likewise fall.

Robbery provided a basis for conviction on the charge of deliberate homicide. Court's Instruction No. 23 provided:

> "A person commits the offense of deliberate homicide if:
>
> "1) He causes the death of another human being purposely or knowingly; or
>
> "2) The death of another human being is caused while the offender is engaged in or is an accomplice in the commission of or an attempt to commit, or flight after committing or attempting to commit robbery or kidnapping."

Thus, the jury could have convicted the defendant by finding that the death of the victim was caused while defendant was engaged in the crime of robbery. Since defendant's conviction for robbery must fall for failure to define theft, necessarily the conviction for deliberate homicide must also be overturned.

Court's Instruction No. 25 defined aggravated kidnapping as follows:

> "A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either using or threatening to use physical force with any of the following purposes:
>
> "1) To facilitate commission of any felony or the flight thereafter; or
>
> "2) To inflict bodily injury on or to terrorize the victim."

The jury could have convicted defendant by finding that defendant restrained the victim for the purpose of committing "any felony" which, of course, includes the charge of robbery. Since the jury could have used the offense of robbery to convict defendant of aggravated kidnapping the conviction on aggravated kidnapping is equally as defective as the conviction for robbery.

I agree with the legal principals enunciated by Justice Shea in his dissent respecting "unanimous verdict" requirements.

I do not agree with all that is said in his dissent in terms of application of that law to the facts at bar. However, the failure to define theft invalidates the convictions on all three crimes charged and it becomes unnecessary to deal with the unanimous verdict question.

In my opinion this case must be reversed and remanded for a new trial under proper instructions. However, I will discuss the sentence imposed. The discussion on sentencing which follows only becomes germane if defendant's conviction is affirmed. The sentencing analysis which is set forth, proceeds upon the assumption that the jury's findings of guilty are upheld.

The death penalty is available under the proper circumstances where defendant is convicted of deliberate homicide. A mitigating factor which the trial court must consider is the role of the defendant in the crime. The court is to consider an accomplice's role as a mitigating factor. Here the trial court could not determine whether the deliberate homicide conviction was on the basis of defendant having committed premeditated murder or rather on the basis that defendant was convicted as an accomplice or under the "felony murder" rule. In this case, as Justice Shea points out in his dissent, the trial court instructed the jury that a person commits the offense of deliberate homicide if death of another human being is caused while the offender is engaged in or is an accomplice in the commission of robbery or kidnapping.

For purposes of sentencing we would have to assume that the defendant was convicted under the instruction which gave to the jury the most latitude. Therefore, for purposes of

sentencing, we must assume that defendant was convicted because the jury found him to be an accomplice in committing both robbery and kidnapping and that the death of another human being was caused thereby. Justice Shea argues that the requirement of jury unanimity is applicable to this situation. In my opinion it is not applicable, but we must assume that the jury convicted under the "felony murder" or accomplice aspect of the instruction. In other words, if six voted for conviction because they believed defendant himself committed the homicide, but six voted to convict defendant because he was an accomplice or death resulted during the commission of a kidnapping, the conviction can only be sustained on the basis that all twelve jurors agreed that the elements were present requiring a conviction under the "felony murder" rule or because defendant was an accomplice. If this assumption is not made, then Justice Shea's argument for "unanimity" must be sustained.

Since we must assume that defendant was convicted as an accomplice or under the "felony murder" aspect of the instruction, we must face the question of whether such a conviction can provide the basis for imposition of the death sentence. Justice White, in a concurring opinion in Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, indicated that the death penalty could only be imposed where the defendant was guilty of premeditated murder thereby foreclosing its application to defendant's conviction as an accomplice or defendant's conviction under a "felony murder" instruction. Furthermore, the role of the defendant is something that must be considered in imposing the death sentence in Montana. Since we must assume that the defendant did not actually kill someone, but rather aided or abetted, a mitigating

factor exists negating the death sentence. This mitigating factor was not treated by the trial court. If we were to assume that defendant was convicted under the "felony murder" instruction, the same result would attach.

The trial court considered "ambush" to be an aggravating circumstance for imposition of the death penalty. I concur in Justice Shea's dissent on this issue. Ambush was not properly considered as an aggravating circumstance where there was no proof that the death of Monte Dyckman resulted from "lying in ambush."

The same problems which exist in defendant's conviction for deliberate homicide exist in defendant's conviction for aggravated kidnapping. We must assume that the defendant's role in aggravating kidnapping was as an accomplice. Not only did the trial court fail to consider defendant's accomplice role as a mitigating factor, but under Justice White's concurring opinion in the Lockett case, the penalty of death could not be imposed where the defendant's role was only that of an accomplice.

In Lockett v. Ohio, supra, Justice White said:

> "It is now established that a penalty constitutes cruel and unusual punishment if it is excessive in relation to the crime for which it is imposed. A punishment is disproportionate 'if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground.' Coker v. Georgia, 433 U.S. 584, 592 (1977) (opinion of White, J.). Because it has been extremely rare that the death penalty has been imposed upon those who were not found to have intended the death of the victim, the punishment of death violates both tests under the circumstances present here. (438 U.S. at 624)
>
> ". . . Under those circumstances the conclusion is unavoidable that the infliction of

death upon those who had no intent to bring
about the death of the victim is not only
grossly out of proportion to the severity of
the crime but also fails to contribute signi-
ficantly to acceptable or, indeed, any per-
ceptible goals of punishment." (438 U.S. at
626)

A majority of the United States Supreme Court has not
settled the question discussed by Justice White in his
concurring opinion in Lockett. Certiorari has now been
granted and the United States Supreme Court will soon determine
this question. In my judgment the Court will follow Justice
White's opinion as quoted above.

Should the federal courts determine that the death sentence
is available under the circumstances of this case, then the
death sentences given, and the circumstances under which they
were given, must be examined. Clearly, in this case, the
acceleration of a sentence from life to death on the deliberate
homicide charge, was in violation of the guideline set forth
in ~~Pierce v. North Carolina~~ North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct.
2072, 23 L.Ed.2d 656. The trial court improperly accelerated
the sentence to a death penalty by considering facts which
occurred prior to the time that the first sentence was
imposed. Secondly, it was improper for the trial court to
consider defendant's demeanor on the witness stand during
the second trial and base an accelerated sentence upon that
demeanor. I concur in the statements made by Justice Shea
on this issue.

We have, indeed, failed to promulgate rules for proportion-
al review as mandated by statute. The imposition of the
death sentence cannot be permitted under these circumstances.
I concur in Justice Shea's dissent on this issue.

I also agree that defendant is entitled to a hearing on
whether hanging is cruel and unusual punishment. The majority

has dismissed this contention by stating that the form of execution is a matter for the legislature. This is not so. The constitution prohibits "cruel and unusual punishment." It is the exclusive province of the judiciary to determine whether that fundamental right is being violated. This determination cannot be made by the legislature. Defendant has raised a substantial claim that, if supported by evidence, would indicate that hanging causes pain and suffering prior to death. This form of execution, if constituting a type of torture, would certainly be cruel and unusual punishment prohibited by the constitution. Only the courts can make this determination and the defendant must have a hearing so that the courts can properly evaluate the medical evidence bearing upon this claim.

I would reverse defendant's conviction and remand for a new trial under appropriate instructions defining theft, robbery, kidnapping, aggravated kidnapping and deliberate homicide.

_____
Justice

In addition to what I have stated in my dissent, I join in Justice Morrison's dissent where he concludes that the failure to define theft for the jury is fatal to both the deliberate homicide conviction and the aggravated kidnapping conviction. Reversal is even more compelling here because Fitzpatrick has been sentenced to death as a result of both convictions. The failure to define theft leaves the certainty of the convictions even more in doubt. This uncertainty cannot be condoned in a capital case.

_____
Justice